ACCEPTED
15-25-00137-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/10/2025 7:14 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00137-CV

IN THE COURT OF APPEALS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/10/2025 7:14:12 PM
CHRISTOPHER A. PRINE
Clerk

FOR THE FIFTEENTH APPELLATE DISTRICT OF TEXAS

---

RIVERSIDE STRATEGIC CAPITAL FUND I, L.P., RSCF BLOCKER TRUE HEALTH, LLC, RSCF I-A BLOCKER TRUE HEALTH, LLC,

*Appellants,*

v.

CLG INVESTMENTS, LLC, ET AL.,

*Appellees.*

---

On Appeal from the Business Court of Texas, First Division (1B)
Trial Court Case No. 25-BC01B-0006
Hon. Bill Whitehill, Presiding

---

APPELLANTS' OPENING BRIEF

ORAL ARGUMENT REQUESTED

---

ROGGE DUNN
State Bar No. 06249500
Dunn@RoggeDunnGroup.com

HARVEY G. JOSEPH
State Bar No. 11027850
Joseph@RoggeDunnGroup.com

LANE M. WEBSTER
State Bar No. 24089042
Webster@RoggeDunnGroup.com

ROGGE DUNN GROUP, PC
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile: (214) 220-3833

*Counsel for Appellants*

## IDENTITY OF PARTIES AND COUNSEL

| Appellants | Counsel |
|---|---|
| Riverside Strategic Capital Fund I, L.P., RSCF Blocker True Health, LLC, and RSCF I-A Blocker True Health, LLC | Rogge Dunn<br>Harvey G. Joseph<br>Lane M. Webster<br>Rogge Dunn Group, PC<br>500 N. Akard Street, Suite 1900<br>Dallas, Texas 75201<br>T: (214) 888-5000<br>F: (214) 220-3833<br>E: Webster@RoggeDunnGroup.com<br><br>William Savitt<br>Adam M. Gogolak<br>Michael S. Avi-Yonah<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York 10019<br>T: (212) 403-1000<br>F: (212) 403-2000<br>E: AMGogolak@wlrk.com |
| Appellees | Counsel |
| CLG Investments, LLC, Christopher Grottenthaler, Covert Investment Operations, LLC, True Health Diagnostic Management, LLC, Richard Covert, Timothy Tatarowicz, Alba Durata, LLC, Melinda Milburn, Jack Novak, Dana Hovind, Tom Wippman, as Trustee of the Tom D. Wippman Revocable Trust, Mark Thomas Smith, Alexandra Nettesheim, Kyle | Ryan Downton<br>The Texas Trial Group<br>875 Carr. 693, Suite 103<br>Dorado, Puerto Rico 00646<br>T: (512) 680-7947<br>E: Ryan@TheTexasTrialGroup.com |

| | |
|---|---|
| Nettesheim, Robert Osterhoff, RJ Investments, Matt Milburn, Michael Clements, Michael Osterhoff, Karen Miller, Edward McCann, Daniel Grottenthaler, Anita Grottenthaler, Christian Richards, Christopher Kling, as Trustee of Christopher W. & Marissa M. Kling Rev Trust U/A/D 5/11/2012, Kevin Nellis, Carol Nellis, Bruce Zivian, Ryan Nellis, and Ancelmo E. Lopes | |
| LCG Ventures, LLC, LCG Ventures II, LLC, Leon Capital Partners, LLC, and Fernando De Leon | J. Sean Lemoine<br>LaDawn H. Nandrasy<br>Zachary C. Farrar<br>Colin P. Benton<br>Camille L. Youngblood<br>Morgan D. Meyer<br>Wick Phillips Gould & Martin, LLP<br>3131 McKinney Avenue, Suite 500<br>Dallas, Texas 75204<br>T: (214) 692-6200<br>F: (214) 692-6255<br>E: Colin.Benton@WickPhillips.com |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..............................................i

TABLE OF CONTENTS ....................................................................iii

INDEX OF AUTHORITIES ................................................................ v

RECORD REFERENCES ...................................................................ix

STATEMENT OF THE CASE ............................................................ 1

STATEMENT REGARDING ORAL ARGUMENT ................................ 2

ISSUES PRESENTED ......................................................................3

INTRODUCTION ............................................................................ 4

STATEMENT OF FACTS ................................................................. 7

SUMMARY OF ARGUMENT .......................................................... 31

ARGUMENT ................................................................................ 34

I.  THE TRIAL COURT ERRED IN GRANTING SUMMARY
    JUDGMENT ON APPELLEES' STATUTE OF
    LIMITATIONS DEFENSE ......................................................... 34

    A.  Standard of review ................................................................ 34

    B.  The statute of limitations on Riverside's claims began
        to run only when it had actual knowledge of Appellees'
        fraud or could have discovered the fraud with
        reasonable diligence ............................................................. 36

    C.  The trial court erred in granting summary judgment
        because there are at minimum disputed issues of
        material fact as to when Riverside's claims accrued ............ 39

        1.  Riverside did not obtain actual knowledge of the
            True Health fraud until Grottenthaler pled
            guilty in 2024 .......................................................... 39

2. The trial court erred in holding that Riverside had "inquiry notice" of the fraud as a matter of law as of April 2020 ...................................................... 41

3. The trial court erred because there are at minimum disputed issues of material fact as to whether through a reasonable investigation Riverside could have uncovered the fraud................... 54

D. The trial court erred in finding that Riverside failed to raise a material issue of disputed fact as to fraudulent concealment ........................................ 58

E. In the alternative, the trial court should have granted a continuance pending completion of fact discovery ........... 61

II. THE TRIAL COURT ERRED IN GRANTING THE SPECIAL APPEARANCES ............................................................ 63

A. Nearly all of the Specially Appearing Appellees waived their right to contest personal jurisdiction in this matter by appearing generally in the trustee litigation ................................................................ 63

B. The Specially Appearing Appellees had substantial contacts with Texas................................................................ 67

C. The trial court erred by failing to consider Appellees' Texas contacts in their totality and in its analysis of the contacts' relatedness to this lawsuit.............................. 73

PRAYER............................................................................................. 76

CERTIFICATE OF SERVICE................................................................. 78

CERTIFICATE OF COMPLIANCE ....................................................... 78

# INDEX OF AUTHORITIES

**Page(s)**

## Cases

*Agar Corp.* v. *Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019) ......................................................36

*Archer* v. *Tregellas*,
566 S.W.3d 281 (Tex. 2018) ......................................................37

*BP Am. Prod. Co.* v. *Marshall*,
342 S.W.3d 59 (Tex. 2011) .................................................37, 43

*Burger King Corp.* v. *Rudzewicz*,
471 U.S. 462 (1985) ...................................................................63

*Estate of Ewers*,
695 S.W.3d 603 (Tex. App.—Houston
[1st Dist.] 2024, no pet.)............................... 36, 37, 38, 41, 44

*ExxonMobil Corp.* v. *Lazy R Ranch, LP*,
511 S.W.3d 538 (Tex. 2017) ......................................................36

*Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ...................................................................75

*Goodyear Tire & Rubber Co.* v. *Mayes*,
236 S.W.3d 754 (Tex. 2007) ......................................................34

*Helix Energy Sols. Grp., Inc.* v. *Gold*,
522 S.W.3d 427 (Tex. 2017) ......................................................34

*Hooks* v. *Samson Lone Star, Ltd. P'ship*,
457 S.W.3d 52 (Tex. 2015) ....................................31, 37-38, 39, 42-43

*Kelly* v. *Gen. Interior Constr., Inc.*,
301 S.W.3d 653 (Tex. 2010) ......................................................29

*KPMG Peat Marwick* v. *Harrison Cnty. Hous. Fin. Corp.*,
988 S.W.2d 746 (Tex. 1999) ......................................................35

*Lobell* v. *Cap. Transp., LLC*,
2015 WL 9436255 (Tex. App.—Austin
Dec. 15, 2015, no pet.) (mem. op.) ...................................................... 72

*M&F Worldwide Corp.* v. *Pepsi-Cola Metro. Bottling Co., Inc.*,
512 S.W.3d 878 (Tex. 2017) ............................................................ 68

*Mann Frankfort Stein & Lipp Advisors, Inc.* v. *Fielding*,
289 S.W.3d 844 (Tex. 2009) ............................................................ 34

*Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc.* v.
*Triex Tex. Holdings, LLC*, 659 S.W.3d 456 (Tex. 2023) ..................... 43

*Mass. Bay Ins. Co.* v. *Adkins*,
615 S.W.3d 580 (Tex. App.—Houston
[1st Dist.] 2020, no pet.)................................................................ 64, 66

*Megadrill Servs. Ltd.* v. *Brighouse*,
556 S.W.3d 490 (Tex. App.—Houston
[14th Dist.] 2018, no pet.) .............................................. 65, 65 n.154

*Moncrief Oil Int'l Inc.* v. *OAO Gazprom*,
414 S.W.3d 142 (Tex. 2013) ............................................................ 71

*Patton* v. *Harris Cnty. Cmty. Supervision & Corr. Dep't*,
2005 WL 3116405 (Tex. App.—Houston
[14th Dist.] Nov. 23, 2005, pet. denied) (mem. op.) .................... 40 n.99

*Petrol. Sols.* v. *Head*,
454 S.W.3d 482 (Tex. 2014) ............................................................ 36

*Primexx Energy Opportunity Fund, LP* v. *Primexx Energy Corp.*,
2025 Tex. Bus. 5, 2025 WL 446345
 (Tex. Bus. Ct. Feb. 10, 2025) ............................................. 63-64, 67-68

*Procarsa S.A. de C.V.* v. *Blue Racer Midstream LLC*,
2024 WL 5066084 (Tex. App.—Dallas
Dec. 11, 2024, no pet.) (mem. op.) ................................................... 73

*Retamco Operating, Inc.* v. *Republic Drilling Co.*,
278 S.W.3d 333 (Tex. 2009) ............................................................ 67

*S.V.* v. *R.V.*,
933 S.W.2d 1 (Tex. 1996) ...................................................... 36, 38

*Scott* v. *Carpenter*,
2022 WL 317060 (Tex. App.—Waco
Feb. 2, 2022, no pet.) (mem. op.) .............................................. 40, 61

*Shell Oil Co.* v. *Ross*,
356 S.W.3d 924 (Tex. 2011) ...................................................... 43

*State* v. *Volkswagen Aktiengesellschaft*,
669 S.W.3d 399 (Tex. 2023) ...................................... 67, 68, 70

*State* v. *Yelp, Inc.*,
2025 WL 2936466 (Tex. App.—15th Dist.
Oct. 16, 2025, no pet. h.) ...................................... 68 n.158, 75

*Sw. Energy Prod. Co.* v. *Berry-Helfand*,
491 S.W.3d 699 (Tex. 2016) ...................................................... 38-39

*Univ. of Hou.* v. *Clark*,
38 S.W.3d 578 (Tex. 2000) ...................................................... 35

*Valdez* v. *Hollenbeck*,
465 S.W.3d 217 (Tex. 2015) ...................................... 31, 37, 38

## Statutes and Rules

42 C.F.R. § 413.70 ...................................................... 9 n.7

6 *Del. C.* § 18-305 ...................................................... 55 n.139

18 U.S.C. § 371 ...................................................... 24

42 U.S.C. § 1320a-7b ...................................................... 7, 7 n.3

Tex. Civ. Prac. & Rem. Code § 16.004 ...................................................... 35

Tex. R. App. P. 39.7 ...................................................... 2

Tex. R. Civ. P. 166a ...................................................... 34

## Other Authorities

Andrew Weissenberg & Dae Y. Lee, *Understanding Management Services Organizations (MSOs): Benefits, Compliance Risks, and Best Practices*, Med. Grp. Mgmt. Ass'n (Feb. 25, 2025), https://www.mgma.com/articles/understanding-management-services-organizations-msos-benefits-compliance-risks-and-best-practices. ...........................................17 n.42

David Robbins & Jason Crawford, *CIDs Are DOJ's Investigatory Tool of Choice*, Bloomberg Law (June 2019), https://www.bloomberglaw.com/external/document/X61SU CQS000000/corporate-compliance-professional-perspective-cids-are-doj-s-inv ....................................................13 n.24

U.S. Dep't Health & Hum. Servs., Off. Inspector Gen., *About Corporate Integrity Agreements*, https://oig.hhs.gov/compliance/corporate-integrity-agreements/about-corporate-integrity-agreements.........................8 n.5

U.S. Dep't Just., Press Release, *Justice Department Files False Claims Act Complaint Against Two Laboratory CEOs, One Hospital CEO and Others Across Texas, New York, and Pennsylvania* (Apr. 4, 2022), https://www.justice.gov/archives/opa/pr/justice-department-files-false-claims-act-complaint-against-two-laboratory-ceos-one-hospital........................................................23 n.66

# RECORD REFERENCES

Appellants will rely upon and cite to the Clerk's Record as "C.R." A supplemental record was filed and will be referenced as "Supp. C.R."

## STATEMENT OF THE CASE

Plaintiffs-Appellants Riverside Strategic Capital Fund I, L.P., RSCF Blocker True Health, LLC, and RSCF I-A Blocker True Health, LLC (collectively, "Riverside") are former investors in True Health Group LLC, a now-defunct blood testing laboratory and services provider. Riverside acquired its interest in True Health pursuant to a Securities Purchase Agreement ("SPA") entered into with Defendants-Appellees, True Health's significant equityholders, in January 2017 (C.R. 0032).

Riverside commenced this action for damages on January 23, 2025, asserting claims for fraud, conspiracy, and money had and received. The Texas-resident defendants filed their answers to the petition on March 7, 2025 and March 31, 2025 (C.R. 0147, 0152, 0157), and the non-Texas-resident defendants filed special appearances on March 31, 2025 (C.R. 0165).

The trial court entered final judgment on August 18, 2025 (C.R. 2959), based on an order *nunc pro tunc* granting summary judgment to the generally appearing defendants on their statute of limitations defense on July 10, 2025 (C.R. 2742) and an order granting the special appearances on July 17, 2025 (C.R. 2935).

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 39.7, Appellants respectfully request oral argument and have noted this request on the front cover of this brief. Oral argument would assist the Court because this case is fact-intensive and involves complex legal questions about summary judgment standards for the accrual of the statute of limitations and Texas law on specific jurisdiction. Appellants believe that oral argument will assist the Court in resolving the complex issues presented.

# ISSUES PRESENTED

1. Whether the trial court erred in granting summary judgment for the generally appearing Appellees on their statute of limitations defense, months before discovery was due to be completed.

2. Whether the trial court erred in denying a continuance of the motion for summary judgment, pending completion of discovery.

3. Whether the trial court erred in granting the special appearances.

## INTRODUCTION

Appellant Riverside and its co-purchasers invested $50 million in True Health pursuant to a Securities Purchase Agreement entered into with Appellees, on the basis of Appellees' express representations that True Health was in material compliance with all relevant healthcare laws. In 2024, however, True Health's former CEO, Appellee Christopher Grottenthaler, admitted as part of a criminal healthcare fraud guilty plea that, in the period before Riverside's investment, he and others had conspired with rural hospitals to provide kickbacks to doctors through Management Services Organizations ("MSOs"), to induce them to refer patients.

Seeking to avoid liability for that fraud, Appellees moved for traditional summary judgment on their statute of limitations defense—less than one month after filing their original answers and before discovery had even started in earnest—claiming that Riverside was aware of its injury by 2019. But under well-established Texas law, in a fraud case like this one, the statute of limitations accrues only when Riverside obtained knowledge of the fraud, or could have obtained knowledge of the fraud with reasonable diligence.

Riverside didn't find out about the True Health fraud until 2024, when Grottenthaler pled guilty. Indeed, prior to that time, Appellees affirmatively concealed True Health's wrongful conduct and the falsity of the representations they used to induce Riverside's investment. Riverside's claims thus did not accrue until years after True Health went bankrupt—and Riverside lost nearly the entirety of its investment. The motion at minimum raised material issues of disputed fact on that issue, warranting discovery and a trial.

The trial court nonetheless granted the motion, finding in its original summary judgment order that Riverside's "causes of action accrued no later than December 6, 2019." The trial court subsequently revised that position in its later summary judgment opinion, holding that Riverside's claims had accrued no later than April 6, 2020, because Riverside "had inquiry notice" by that date. That determination was error and should be reversed. The issue of inquiry notice raises issues of fact not properly determined on summary judgment—a point underscored by the trial court's shifting positions as to when Riverside's claims actually accrued. And in any event, none of the facts identified by the trial court, alone or in the aggregate, triggered a duty to investigate the MSO

kickback scheme perpetrated by True Health. Nor did the summary judgment record establish as a matter of law that Riverside could have uncovered the fraud with reasonable diligence based on the information available to it. At minimum, the trial court should have ordered a continuance, allowing Riverside to conduct full discovery, before resolving the motion. Its failure to do so was further error.

The trial court also erred in finding that the court lacked jurisdiction over the specially appearing defendants when among other things those same defendants had substantial contacts with Texas and had filed general appearances in a Texas action arising out of the same transactions as this one. That determination too should be reversed.

## STATEMENT OF FACTS

### A.    True Health

Appellee Christopher Grottenthaler founded True Health in March 2014.[1] True Health was a Frisco, Texas-based company that provided laboratory blood testing and diagnostic services.[2] Given its business operations, True Health was subject to a number of federal laws that in relevant part target the illegal remuneration of healthcare providers in connection with claims for reimbursement submitted to federal healthcare programs like Medicare. These laws include the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).[3]

In 2015, True Health expanded its laboratory processing capacity by purchasing the assets of Health Diagnostic Laboratory, Inc. ("HDL"),

---

[1] C.R. 0046 (Original Petition ¶ 57); C.R. 1888. True Health Diagnostics, LLC ("THD") later became a subsidiary of True Health Group, LLC ("THG" or "True Health") following a corporate reorganization. C.R. 0048 (Original Petition ¶ 62). Except when necessary to distinguish between THD and THG, Riverside refers to the general enterprise as "True Health."

[2] C.R. 1888.

[3] Subject to certain exceptions, the Anti-Kickback Statute makes it a felony to "offer[] or pay[] . . . any kickback . . . to induce [a] person . . . to refer an individual to a person" for services paid by federal healthcare programs like Medicare. 42 U.S.C. § 1320a-7b(b)(2)(A).

another blood testing company that had gone into bankruptcy.[4] As part of this purchase, True Health agreed to adopt the Corporate Integrity Agreement ("CIA") that HDL had previously reached as part of a settlement of regulatory compliance issues with the U.S. Department of Health and Human Services' Office of Inspector General ("HHS OIG").[5] Under the CIA, True Health agreed among other things to implement a comprehensive healthcare compliance program overseen by the company's chief compliance officer; to engage an Independent Review Organization to monitor the company's third-party arrangements; for its management to certify annually to the HHS OIG the company's compliance with the CIA; and to submit annual reports to the HHS OIG detailing the compliance program implemented by the company under the CIA.[6]

---

[4] C.R. 1723 (Affidavit of Hal Greenberg in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ¶ 5 (June 25, 2025) ("Greenberg Affidavit")).

[5] C.R. 2089. HHS OIG generally uses CIAs as part of settlements of healthcare investigations, and these agreements "aim to strengthen an entity's compliance program and promote compliance so that future issues can be prevented or identified, reported, and corrected." HHS OIG, *About Corporate Integrity Agreements*, https://oig.hhs.gov/compliance/corporate-integrity-agreements/about-corporate-integrity-agreements.

[6] C.R. 1723-1724 (Greenberg Affidavit ¶ 5); C.R. 2142; C.R. 2275-2284; C.R. 2084-2284.

Over the ensuing years, True Health developed extensive operations in Texas, including entering into laboratory processing arrangements with Texas hospitals—such as Rockdale, Texas-based Little River Healthcare ("Little River")[7]—and marketing its laboratory testing services to healthcare providers in the state.[8] Given these business activities, True Health employees and executives in turn performed extensive work in Texas. *See infra* pp. 69-70.

### B. Riverside invests $50 million in True Health in reliance on Appellees' representations about its business, allowing Appellees to cash out over $100 million

In 2016, True Health pursued a recapitalization, which allowed Appellees—True Health's then-current significant equityholders—to collectively cash out over $100 million from the company.[9] As part of that recapitalization, Appellant Riverside and two co-purchasers agreed to

---

[7] "Critical access hospitals," like Little River, provide healthcare services to underserved rural communities. To incentivize hospitals to serve such communities, critical access hospitals are entitled to higher, "cost-plus" reimbursement rates from Medicare for clinical diagnostic laboratory tests, so long as the patient is an inpatient or outpatient of the hospital. *See* 42 C.F.R. § 413.70.

[8] *E.g.*, C.R. 0582; C.R. 1391.

[9] C.R. 0987.

invest $50 million[10] in True Health through the SPA dated January 26, 2017, entered into with Appellees.[11]

Prior to entering into the SPA, Riverside knew that True Health operated in a highly regulated industry, and that it was subject to myriad healthcare rules and regulations, including as a result of its government reimbursement business. Riverside would not have invested without express assurance that True Health was in compliance with such laws. Riverside therefore both conducted months of due diligence on the company and also expressly negotiated in the SPA for several representations about the company's legal and regulatory compliance—including with regard to its business activities in Texas—to which Appellees jointly and severally warranted.[12] Appellees warranted that:

- "the Company is, and has been since the Date of First Operations, in compliance in all material respects with all applicable Healthcare Laws";[13]

---

[10] Other investors provided $110 million in debt financing. Overall, the recapitalization raised $160 million from outside investors. C.R. 0051 (Original Petition ¶ 72).

[11] C.R. 1745-1835 (SPA (Jan. 26, 2017)). Appellees appointed CLG Investments, LLC—a Grottenthaler-controlled and Frisco-based entity—as their agent and attorney-in-fact under the agreement. C.R. 1782 (SPA § 6.1); C.R. 0035 (Original Petition ¶ 14).

[12] C.R. 1722-1724 (Greenberg Affidavit ¶¶ 4-6).

[13] C.R. 1772 (SPA § 4.14(a)).

- "all material contracts, including those with referral sources, . . . are in compliance in all material respects with all applicable Healthcare Laws . . . .";[14] and

- "all billings and collections by the Company for its services, . . . have been in compliance in all material respects with all applicable Healthcare Laws . . . ."[15]

Riverside was also aware that True Health had previously purchased HDL's assets, and that it had assumed the obligations of the CIA in connection with that transaction.[16] Riverside therefore obtained Appellees' express representation that "[t]he Company is in material compliance with the terms and requirements of the [CIA]."[17]

Based on these representations, Riverside believed that True Health was in material compliance with all relevant healthcare laws when it entered into the SPA. Riverside would not have invested in True Health absent Appellees' representations.[18]

---

[14] C.R. 1773 (SPA § 4.14(a)).

[15] C.R. 1773 (SPA § 4.14(b)).

[16] C.R. 1723-1724 (Greenberg Affidavit ¶ 5).

[17] C.R. 1771 (SPA § 4.10).

[18] C.R. 1724 (Greenberg Affidavit ¶ 6).

### C. Following True Health's recapitalization, True Health faces— and addresses—regulatory scrutiny from DOJ and CMS

At the time of the Riverside's investment, True Health was one of the largest private blood testing labs in the country, with quarterly revenues of nearly $42 million and quarterly EBITDA of over $10 million.[19] It processed close to 2,000 samples per day.[20]

After the recapitalization, Riverside held a minority equity interest in True Health and one of its principals, Hal Greenberg, joined both the company's board and the board's compliance committee.[21] Riverside and its representatives, however, had no material involvement in the company's day-to-day operations or business strategy, nor a management role.[22] Greenberg and others at Riverside thus had to rely on company management to ensure True Health's compliance with the CIA and healthcare laws more generally.[23]

---

[19] C.R. 0410.

[20] C.R. 0412.

[21] C.R. 1724-1725 (Greenberg Affidavit ¶ 7).

[22] C.R. 1725 (Greenberg Affidavit ¶ 7).

[23] *E.g.*, C.R. 1725-1726 (Greenberg Affidavit ¶ 8).

In March 2017, the U.S. Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to True Health.[24] While the demand stated that it was being made pursuant to a federal False Claims Act investigation and "concern[ed] allegations of medically unnecessary laboratory testing," it did not discuss any particular True Health business practices or identify any particular instances of improper conduct.[25] True Health promptly retained outside counsel to respond to the demand and Greenberg received periodic updates about the company's response from management and the company's counsel.[26] Management and outside counsel never informed Riverside of any information that was uncovered as a result of the company's response to the CID that led Riverside to believe that it had been deceived through the SPA's representations about healthcare law compliance.[27]

---

[24] C.R. 1837-1860. CIDs are commonplace. DOJ's Civil Division authorized well over 600 CIDs in 2017 alone. *See* David Robbins & Jason Crawford, *CIDs Are DOJ's Investigatory Tool of Choice*, Bloomberg Law (June 2019), https://www.bloomberglaw.com/external/document/X61SUCQS000000/corporate-compliance-professional-perspective-cids-are-doj-s-inv.

[25] C.R. 1837.

[26] C.R. 1726-1727 (Greenberg Affidavit ¶ 10).

[27] C.R. 1726-1727 (Greenberg Affidavit ¶ 10).

In May 2017, the Centers for Medicare and Medicaid Services ("CMS") sent a letter to True Health identifying eight claims for reimbursement that allegedly "failed to meet Medicare guidelines" and suspending Medicare payments to True Health.[28] True Health's management hired counsel and subsequently researched the eight claims, none of which concerned True Health's rural hospital business. Management reported to Riverside that the allegations were "frivolous," with some of the flagged claims involving mundane administrative errors.[29] True Health's counsel sent a rebuttal letter to CMS and CMS ultimately reduced the suspension to 35% of Medicare payments.[30]

During this period and in the ensuing years, True Health's management continued to certify in annual reports submitted to the HHS OIG that True Health was in material compliance with its obligations under applicable healthcare requirements and under the CIA.[31] In response, the HHS OIG sent a letter to True Health confirming its

---

[28] C.R. 1862-1864.

[29] C.R. 1727-1728 (Greenberg Affidavit ¶ 12); *see also* C.R. 1866-1868 (Riverside internal memorandum summarizing management's findings regarding the eight cited claims (June 1, 2017)).

[30] C.R. 1728-1729 (Greenberg Affidavit ¶ 13).

[31] C.R. 1730 (Greenberg Affidavit ¶ 15).

view that True Health appeared to be compliant with the CIA during the reporting period.[32]

### D. True Health's financial condition deteriorates, and Riverside invests an additional $30 million in the company

By late 2017, the continued 35% CMS payment suspension had taken a toll on True Health's cash position. Riverside and its co-investors provided over $30 million in additional funding to shore up the company's finances.[33] Riverside would not have made that substantial additional investment in True Health if it had reason to believe that True Health was violating applicable healthcare laws.[34]

From late 2018 into 2019, True Health and the federal agencies negotiated a proposed settlement agreement that Riverside hoped would resolve CMS's ongoing payment suspension.[35] By June 2019, True Health and its directors—including Greenberg—came to believe that they had reached an agreement in principle with the government after extensive negotiations that would have led to CMS lifting its 35% payment

---

[32] C.R. 2293-2294.

[33] C.R. 1731 (Greenberg Affidavit ¶ 17).

[34] C.R. 1731 (Greenberg Affidavit ¶ 17).

[35] C.R. 1734 (Greenberg Affidavit ¶ 21).

suspension.[36] The True Health board approved a draft settlement agreement in which the company expressly denied the DOJ's allegations of wrongdoing.[37]

Before signing the settlement agreement, however, CMS imposed a new, 100% payment suspension.[38] While the notice claimed to be for "recent credible allegations of fraud" that were "distinct from" the prior suspension, True Health's Chief Financial Officer, Appellee Christian Richards, informed Greenberg that the five claims identified in the notice had already been subject to review as part of a 2017 audit related to the first CMS suspension.[39] Believing the suspension to be unreasonable government overreach based on representations from Appellees, in July 2019, True Health sued CMS and HHS in the U.S. District Court for the Eastern District of Texas, seeking a temporary restraining order against the new suspension.[40]

---

[36] C.R. 1734 (Greenberg Affidavit ¶ 21).

[37] C.R. 1734-1735 (Greenberg Affidavit ¶ 21).

[38] C.R. 1735 (Greenberg Affidavit ¶ 22); C.R. 1952-1954.

[39] C.R. 1735 (Greenberg Affidavit ¶ 22); C.R. 1952.

[40] C.R. 1735-1736 (Greenberg Affidavit ¶ 23).

On July 5, 2019, the HHS OIG submitted a declaration by OIG special agent Jack Geren ("Geren Declaration") in support of its opposition to the motion for a temporary restraining order.[41] The Geren Declaration alleged that True Health had conspired to provide kickbacks to healthcare providers through purported investments in MSOs to induce providers to order laboratory testing through rural hospitals, including Little River.[42] True Health's management and its outside counsel, however, had repeatedly and expressly represented to Riverside that True Health did not have relationships with MSOs or otherwise involve itself in such practices.[43] Riverside nonetheless promptly investigated Geren's allegations and concluded that Geren had mischaracterized many of the documents relied upon for the

---

[41] C.R. 1956-1964 (Declaration of Jack J. Geren, Jr., *True Health Diagnostics, LLC* v. *Azar*, No. 19-CV-110 (E.D. Tex. July 5, 2019).

[42] C.R. 1957-1960 (Geren Declaration ¶¶ 5-18). MSOs are organizations that provide non-clinical services to healthcare practices, including as to human resources, claim coding, and billing. *See* Andrew Weissenberg & Dae Y. Lee, *Understanding Management Services Organizations (MSOs): Benefits, Compliance Risks, and Best Practices*, Med. Grp. Mgmt. Ass'n (Feb. 25, 2025), https://www.mgma.com/articles/understanding-management-services-organizations-msos-benefits-compliance-risks-and-best-practices.

[43] C.R. 1736 (Greenberg Affidavit ¶ 24); C.R. 1928-1945 (Appellee Michael Osterhoff's draft talking points for a meeting with DOJ that Riverside received); C.R. 1948 ("THD did not do business with MSOs.").

allegations.[44] True Health's general counsel, Appellee Michael Osterhoff, went so far as to write that the "[c]itation to these docs is total garbage by the [government]."[45] Based on these communications and the review of Geren's cited documents, Riverside came to believe that the declaration did not credibly support the conduct Geren alleged.[46] True Health's management concurred in that assessment.[47]

In fact, notwithstanding Geren's declaration, the court granted True Health's motion for a temporary restraining order against the CMS suspension and the company then moved for a preliminary injunction against the same.[48] Geren did not appear at the hearing on the preliminary injunction to provide live testimony to support the allegations in his declaration.[49]

---

[44] C.R. 1736-1737 (Greenberg Affidavit ¶ 25).

[45] C.R. 1736-1737 (Greenberg Affidavit ¶ 25).

[46] C.R. 1740 (Greenberg Affidavit ¶ 30).

[47] C.R. 1740 (Greenberg Affidavit ¶ 30).

[48] C.R. 2299-2305.

[49] C.R. 1740-1741 (Greenberg Affidavit ¶ 31).

### E. True Health files for bankruptcy and the liquidating trustee serves a notice of claims on True Health's former officers and directors

The district court ultimately dismissed True Health's lawsuit for lack of subject matter jurisdiction and the company declared bankruptcy on July 30, 2019.[50] At the time of its bankruptcy, True Health was one of the largest privately held labs in the country.[51]

The bankruptcy court ultimately lifted the renewed CMS suspension over the government's objection, releasing the funds withheld after the bankruptcy petition was filed to True Health.[52] After True Health sold certain of its assets to Quest Diagnostics, the bankruptcy court approved a liquidation plan for the company in November 2019, which became effective on December 6, 2019.[53] Pursuant to the plan, the court approved payment of certain creditor claims—with True Health's senior creditors receiving only a small percentage of amounts owed; True Health's remaining assets were transferred to a liquidation trust (including most litigation claims); True Health's directors were deemed

---

[50] C.R. 1741 (Greenberg Affidavit ¶ 32).

[51] C.R. 0475.

[52] C.R. 1741 (Greenberg Affidavit ¶ 32).

[53] C.R. 0052 (Original Petition ¶ 77).

resigned; and True Health's equity interests were "deemed canceled, extinguished and discharged and of no further force or effect."[54] As a result, Riverside's relationship with True Health was severed, and it lost access to its books and records at that time.[55]

On April 6, 2020, counsel for True Health's liquidating trust, who represented True Health's creditors,[56] sent a notice of claims to former officers and directors of the company, including Riverside's designees as well as Appellees Grottenthaler, Osterhoff, Richards, and director Tom D. Wippman.[57] The notice alleged that "[a]t all times on and after May 19, 2018, the [True Health] directors failed to pursue a strategic course that would maximize and protect the value of True Health and its stakeholders (including its lenders)," leading to its bankruptcy.[58]

---

[54] *See* Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation Proposed by the Debtors, DIP Agent and Official Committee of Unsecured Debtors, *In re THG Holdings LLC*, No. 19-11689 (Bankr. D. Del. Nov. 27, 2019), ECF No. 531-1; Notice of (I) Effective Date of Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation Proposed by the Debtors, DIP Agent and Official Committee of Unsecured Creditors and (II) Certain Claims Bar Dates, *In re THG Holdings LLC*, No. 19-11689 (Bankr. D. Del. Dec. 6, 2019), ECF No. 552.

[55] C.R. 1741 (Greenberg Affidavit ¶ 33).

[56] The creditors included those who had provided the $110 million in debt financing in connection with True Health's 2017 recapitalization.

[57] C.R. 0902-0905.

[58] C.R. 0902.

Specifically, the notice alleged that "[d]uring a period when True Health was undeniably insolvent, the directors and officers abdicated crucial decision making for the Company by delegating excessive authority to the Company's Chief Executive Officer, whose loyalty and personal interests were completely at odds with the interests of True Health" and "failed to adequately monitor decision-making at the Company, particularly as it related to ongoing legal and regulatory compliance, remediation and negotiations with the Department of Justice."[59] The notice did not include any mention of healthcare fraud or MSOs, or otherwise identify any specific unlawful or fraudulent business practices on the part of the company.

## F. The liquidating trustee files suit, and DOJ intervenes in a qui tam action against True Health

In January 2021, after a multi-year investigation with direct access to True Health's books and records, True Health's liquidating trustee filed suit in Dallas County District Court, naming as defendants certain of True Health's former directors, officers, and equityholders, including all but three of the Appellees who filed special appearances below (the

---

[59] C.R. 0902.

"Specially Appearing Appellees").[60] The suit did not name Riverside or any of its representatives as defendants.[61] The trustee lawsuit alleged that the former True Health directors and officers breached their fiduciary duties by enabling a number of improper business practices at the company, including through True Health's relationships with rural hospitals.[62] The trustee also sued for fraud, alleging that True Health's creditors had been fraudulently induced to provide the debt financing in connection with the recapitalization through concealment of True Health's non-compliance with healthcare laws.[63] All of the Specially Appearing Appellees named in the lawsuit filed general appearances without contesting personal jurisdiction.[64]

In December 2021, after a six-year investigation, DOJ intervened in a qui tam action in the U.S. District Court for the Eastern District of

---

[60] C.R. 0907 (Plaintiff's Original Petition ("Trustee Petition"), *Willow Tree Consulting Grp., LLC* v. *Grottenthaler*, No. DC-21-01060 (Dallas Cnty. Dist. Ct. Jan. 25, 2021) ("Trustee Litigation")). The three Specially Appearing Appellees not named in the Trustee Litigation are Anita Grottenthaler, Kevin Nellis, and Kyle Nettesheim.

[61] C.R. 0907 (Trustee Petition at 1).

[62] C.R. 0960-0962 (Trustee Petition ¶¶ 215-223 (breach of fiduciary duty claim)).

[63] *See* C.R. 0976-0977 (Trustee Petition ¶¶ 322-337 (fraud asserted against former True Health directors and officers)).

[64] C.R. 1407-1413 (Passive Transferee Defendants' Answer (Apr. 26, 2021)); C.R. 1418-1429 (Director and Officer Defendants' Answer (Mar. 22, 2021)).

Texas that had been filed under seal against True Health in 2015.[65] The court then unsealed DOJ's complaint against Christopher Grottenthaler and others that alleged violations of the federal False Claims Act, arising out of True Health's relationship with Little River and other rural hospitals.[66]

## G.    Grottenthaler pleads guilty to a criminal kickback conspiracy

In September 2022, Grottenthaler and others were indicted by a grand jury sitting in the Eastern District of Texas; the indictment was unsealed the following month.[67] The indictment stated that beginning in 2015, two years before the SPA was signed, True Health (i) conspired with rural hospitals for those hospitals to provide kickbacks to healthcare providers through MSOs, to induce those providers to send lab tests to

---

[65] C.R. 2321-2323 (U.S. Notice of Intervention, *United States ex rel. STF, LLC* v. *True Health Diagnostics, LLC*, No. 16-CV-547 (E.D. Tex. Dec. 20, 2021)).

[66] DOJ, Press Release, *Justice Department Files False Claims Act Complaint Against Two Laboratory CEOs, One Hospital CEO and Others Across Texas, New York, and Pennsylvania* (Apr. 4, 2022), https://www.justice.gov/archives/opa/pr/justice-department-files-false-claims-act-complaint-against-two-laboratory-ceos-one-hospital.

[67] C.R. 2328-2379 (Indictment, *United States* v. *Grottenthaler*, 22-CR-135 (E.D. Tex. Sept. 22, 2022) ("Criminal Case") ("Grottenthaler Indictment")).

True Health,[68] and (ii) conspired with rural hospitals to receive kickbacks for processing blood tests on the hospitals' behalf, which the hospitals submitted to federal health insurers (among others) as outpatient tests in order to obtain higher reimbursement rates, all while the hospitals and True Health knew that these patients were not bona fide outpatients.[69] Grottenthaler entered a plea of not guilty at his arraignment held on October 20, 2022.[70]

Two years later, on October 7, 2024, Grottenthaler entered a guilty plea to one count of conspiracy to pay and receive illegal kickbacks in violation of 18 U.S.C. § 371, as set forth in the indictment.[71] Riverside learned of Grottenthaler's guilty plea in late 2024.[72]

---

[68] C.R. 2347. Specifically, the indictment alleged (C.R. 2344):

> Little River, Stamford, and other hospitals utilized networks of MSOs that purported to offer investment opportunities to health care providers (HCPs) throughout the State of Texas. In reality, the MSOs were a means to facilitate payments to HCPs in return for the providers' laboratory referrals. Pursuant to the kickback scheme, the hospitals paid a portion of their laboratory profits to recruiters, who in turn kicked back those funds to the referring providers who ordered THD tests from the hospitals or from THD directly.

[69] C.R. 2344, 2345, 2347, 2350.

[70] C.R. 0053 (Original Petition ¶ 80).

[71] C.R. 2066-2068 (Criminal Case, Factual Basis (Sept. 24, 2024)).

[72] C.R. 1742 (Greenberg Affidavit ¶ 34).

## H. Riverside files suit, seeking compensation for Appellees' fraud

Three months after Grottenthaler pled guilty, Riverside commenced this action on January 23, 2025 in the 298th Dallas County District Court.[73] Riverside asserted claims for fraud, money had and received, and conspiracy against Appellees for the fraudulent misrepresentations they made in the SPA regarding True Health's compliance with healthcare laws.[74]

Appellees LCG Ventures, LLC, LCG Ventures II, LLC, and Leon Capital Partners, LLC (with Fernando De Leon, the "De Leon Appellees") removed the action to the Business Court on March 7, 2025.[75] The Specially Appearing Appellees filed special appearances on March 31, 2025, contesting the jurisdiction of the Texas courts over them.[76]

The De Leon Appellees filed a motion for summary judgment on their statute of limitations defense on April 4, 2025—less than one month

---

[73] C.R. 0031-0059 (Original Petition (Jan. 23, 2025)).

[74] C.R. 0032-0034 (Original Petition ¶¶ 1-6); C.R. 0054-0055 (Original Petition ¶¶ 83-89 (fraud claim)); C.R. 0055-0056 (Original Petition ¶¶ 90-92 (money had and received claim)); C.R. 0056-0057 (Original Petition ¶¶ 93-98 (conspiracy claim)).

[75] C.R. 0005-0011.

[76] C.R. 0165-0198.

after they filed their answer to the Original Petition and before any discovery had been exchanged.[77]

The trial court entered a scheduling order for the case on April 8, 2025, under which the parties would conduct discovery through late November 2025, with dispositive motions to be filed in early December.[78] Riverside served requests for production to each group of generally appearing Appellees and responded to the special appearances on April 28, 2025.[79] While Riverside had requested that the trial court defer consideration of the summary judgment motion until the post-discovery dispositive motions period provided in the scheduling order, the court denied this request and instead set a hearing on the motion for July 3, 2025—nearly five months before the end of fact discovery and nearly half a year before the scheduling order's dispositive motions deadline.

Riverside filed its response to the summary judgment motion, and in the alternative a motion for a continuance, on June 26, 2025.[80] On July

---

[77] C.R. 0210-0250. The other generally appearing Appellants joined in the motion. C.R. 1569.

[78] C.R. 1035-1043.

[79] C.R. 1615-1631 (Requests for Production to LCG Appellees (Apr. 7, 2025)); C.R. 1633-1649 (Requests for Production to Fernando De Leon (Apr. 30, 2025)); C.R. 1045-1079 (Appellants' Response to Special Appearances (Apr. 28, 2025)).

[80] C.R. 1665-1713; C.R. 1041 (dispositive motions deadline in Scheduling Order).

3, 2025, the trial court heard argument on the summary judgment motion.

## I. The trial court grants the motion for summary judgment and special appearances

*Summary Judgment.* On July 10, 2025, the trial court issued an order denying any continuance and granting summary judgment in favor of the generally appearing Appellees.[81] The court's order stated that "Defendants conclusively established that all of plaintiffs' causes of action accrued no later than December 6, 2019—when the related bankruptcy proceedings were substantially consummated" and that Riverside's claims were thus time-barred.[82]

Two months later, the trial court issued an opinion on the summary judgment motion. In the opinion, however, the trial court no longer stood by its prior determination that Riverside's claims had accrued in December 2019. Rather, the trial court held that Riverside's claims accrued months later, "no later than April 6, 2020, when the trustee sent

---

[81] C.R. 1710-1711 (request for a continuance in Appellants' Opposition to Summary Judgment); C.R. 2560-2562 (Order on Summary Judgment (July 10, 2025)); Supp. C.R. 0003-0029 (Opinion on Summary Judgment (Sept. 17, 2025) ("MSJ Op.")).

[82] C.R. 2744 (Order on Summary Judgment at 3).

the claim notice letter to True Health's former directors and officers."[83] The trial court stated that several events preceding the notice supported that conclusion, but it did not find that any of these events alone or in the aggregate triggered a duty on the part of Riverside to investigate the fraud.[84] The trial court found, however, that by the time of the April 6, 2020 notice, "Riverside had notice of (i) a history of allegations against True Health for illegal business practices and (ii) investigations engaged in by disinterested third parties tying those improper business practices to Riverside's economic loss and even accusing Riverside's principals of wrongdoing themselves."[85] The trial court concluded that this was sufficient notice to begin the accrual period for Riverside's fraud and conspiracy causes of action as of that date.[86] The court further found that Riverside could have discovered the fraud within four years had it conducted a reasonable investigation.[87] Finally, the court concluded that

---

[83] Supp. C.R. 0020 (MSJ Op. at 17).

[84] Supp. C.R. 0020-0021 (MSJ Op. at 17-18).

[85] Supp. C.R. 0024 (MSJ Op. at 21); *see* Supp. C.R. 0022-0023 (MSJ Op. at 19-20 (listing various events)).

[86] Supp. C.R. 0024 (MSJ Op. at 21).

[87] Supp. C.R. 0025-0027.

Riverside failed to create a genuine issue of material fact as to fraudulent concealment.[88]

*Special Appearances*. On July 17, 2025, following jurisdictional discovery and supplemental briefing on the special appearances,[89] the court issued an order granting the special appearances.[90]

On August 19, 2025, the trial court issued a memorandum opinion explaining its reasoning for granting the special appearances. The court held that Riverside had failed to plead sufficient facts in its petition to establish the court's jurisdiction over the Specially Appearing Appellees.[91] Relying on the Supreme Court's decision in *Kelly* v. *General Interior Construction, Inc.*, 301 S.W.3d 653 (Tex. 2010), the trial court held that it did not need to consider the evidence Riverside submitted in opposition to the special appearances because "the evidence submitted in

---

[88] Supp. C.R. 0028 (MSJ Op. at 25).

[89] C.R. 2579-2580 (summarizing the Specially Appearing Appellees' deposition testimony).

[90] C.R. 2935-2937 (Order on Special Appearances (July 17, 2025)); C.R. 2964-3000 (Memorandum Opinion on Special Appearances (Aug. 19, 2025) ("Special Appearances Op.")).

[91] C.R. 2981-2984 (Special Appearances Op. at 18-21).

its oppositions does not relate to any non-conclusory allegations in its pleading."[92]

The trial court further found that, even considering the evidence presented by Riverside on the special appearances, it had not established personal jurisdiction over the Specially Appearing Appellees. The trial court held that there was an insufficient connection between the defendants' contacts with Texas and "the operative facts of this litigation."[93] The court also rejected what it deemed a "consent-based" argument that the forum selection clause in the 2017 True Health LLC agreement executed the same day as the SPA meant that the Specially Appearing Appellees consented to the court's jurisdiction in this case.[94] Finally, the court rejected Riverside's argument that most of the Specially Appearing Appellees had waived any objection to jurisdiction by filing general appearances in the trustee litigation.[95]

---

[92] C.R. 2983 (Special Appearances Op. at 20).

[93] C.R. 2988 (Special Appearances Op. at 25).

[94] C.R. 2986; C.R. 2995-2997 (Special Appearances Op. at 32-34).

[95] C.R. 2999 (Special Appearances Op. at 36).

## SUMMARY OF ARGUMENT

The trial court's grant of summary judgment and of the special appearances should be reversed.

The trial court granted summary judgment on statute of limitations grounds nearly half a year before dispositive motions were due to be filed and in the absence of any substantial merits discovery. This was error.

In a fraudulent inducement action like this one, the statute of "limitations does not start to run until the fraud with respect to the contract is discovered or the exercise of reasonable diligence would discover it." *Hooks* v. *Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015). That is because "a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations." *Valdez* v. *Hollenbeck*, 465 S.W.3d 217, 230 (Tex. 2015) (internal quotation marks omitted). When a plaintiff actually discovered a fraud or would have upon reasonable diligence ordinarily presents an issue of *fact* not properly resolved on summary judgment. *See Hooks*, 457 S.W.3d at 58.

Riverside did not obtain actual knowledge of the True Health MSO fraud until Grottenthaler pled guilty in 2024. The trial court's determination that Riverside nonetheless had "inquiry notice" of the fraud over four years earlier was error. The question as to whether and when Riverside would have discovered the fraud with additional diligence presents an issue of fact that was not properly resolved on summary judgment. And in any event, many of the "facts" that the trial court relied on to find inquiry notice as a matter of law had nothing to do with and gave no notice of True Health's kickback scheme involving rural hospitals and MSOs. Moreover, True Health's officers and directors, including True Health's general counsel, affirmatively concealed that kickback scheme from Riverside throughout the relevant time period, tolling the statute of limitations. At minimum, the trial court should have continued the summary judgment motion to allow Riverside to complete full discovery before the motion's resolution.

The trial court also erred by granting the special appearances. Most of the Specially Appearing Appellees filed general appearances in the trustee litigation without contesting the Dallas court's jurisdiction over them. They therefore waived the right to contest the trial court's

jurisdiction here—a case involving the same transactions and alleged wrongdoing. In any event, the Specially Appearing Appellees had substantial contacts with Texas and could reasonably have expected to be haled into court here through their investment in and employment at True Health, their agreement to the True Health LLC agreement—with a Texas jurisdictional consent provision—in connection with the SPA, and their designation of a Texas-based agent in the SPA.

# ARGUMENT

## I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON APPELLEES' STATUTE OF LIMITATIONS DEFENSE

### A. Standard of review

A court of appeals reviews a trial court's grant of a summary judgment motion de novo. *Helix Energy Solutions Grp., Inc.* v. *Gold*, 522 S.W.3d 427, 431 (Tex. 2017). Under Texas Rule of Civil Procedure 166a(c), a court may enter summary judgment only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact exists, the court must "review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered," *Mann Frankfort Stein & Lipp Advisors, Inc.* v. *Fielding*, 289 S.W.3d 844, 848 (Tex. 2009), "indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion," *Goodyear Tire & Rubber Co.* v. *Mayes*, 236 S.W.3d 754, 756 (Tex. 2007). Summary judgment should be denied whenever "reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented." *Id.* at 755.

Appellees moved for—and the trial court granted—summary judgment based on a statute of limitations defense. Appellees therefore held the burden to conclusively establish that defense as a matter of law. *Univ. of Hou.* v. *Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *KPMG Peat Marwick* v. *Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). To do so, Appellees were required to "(1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *KPMG Peat Marwick*, 988 S.W.2d at 748.

Appellants brought three causes of action in their Original Petition: fraud, money had and received, and conspiracy.[96] Fraud—and by extension conspiracy—have four-year statutes of limitations, whereas money had and received has a two-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(4) (fraud); *id.* § 16.003 (money had

---

[96] C.R. 0054-0055 (Original Petition ¶¶ 83-89 (fraud)); C.R. 0055-0056 (Original Petition ¶¶ 90-92 (money had and received)); C.R. 0056-0057 (Original Petition ¶¶ 93-98 (conspiracy)).

and received); *Agar Corp.* v. *Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) (holding that civil conspiracy shares the statute of limitations of its underlying tort). Given that Riverside filed its Original Petition on January 23, 2025, Appellees were required to conclusively establish that Riverside's claims for fraud and conspiracy accrued on or before January 23, 2021, and the claim for money had and received accrued on or before January 23, 2023.

B.   **The statute of limitations on Riverside's claims began to run only when it had actual knowledge of Appellees' fraud or could have discovered the fraud with reasonable diligence**

A claim generally accrues "when facts exist that authorize a claimant to seek judicial relief." *ExxonMobil Corp.* v. *Lazy R Ranch, LP*, 511 S.W.3d 538, 542 (Tex. 2017). Texas law, however, recognizes two well-established exceptions to this standard: the discovery rule and fraudulent concealment. *Estate of Ewers*, 695 S.W.3d 603, 619 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (citing *Petrol. Sols.* v. *Head*, 454 S.W.3d 482, 486 (Tex. 2014)); *see also S.V.* v. *R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (discussing discovery rule and fraudulent concealment).

Both exceptions are similar in effect in that they prevent the statute of limitations from barring claims that were otherwise not brought within

the limitations period. *Ewers*, 695 S.W.3d at 619. When the nature of an injury is inherently undiscoverable and the evidence of injury is objectively verifiable, the discovery rule defers accrual of a cause of action until the plaintiff knew or should have known of the facts giving rise to the cause of action. *E.g., Archer* v. *Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018). And where a defendant conceals his wrongdoing, the doctrine of fraudulent concealment tolls the statutes of limitation even after a cause of action has accrued. *BP Am. Prod. Co.* v. *Marshall*, 342 S.W.3d 59, 67 (Tex. 2011); *see also Ewers*, 695 S.W.3d at 621 (fraudulent concealment tolls the statute of limitations where "defendant[s] actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong").

The rationale for applying these doctrines to fraud claims like those asserted here is straightforward and commonsensical: "Texas courts have long recognized that 'fraud vitiates whatever it touches,' and we have consistently held that 'a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations.'" *Valdez*, 465 S.W.3d at 230 (citation omitted); *see also*

*Hooks*, 457 S.W.3d at 57 ("a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run" (internal quotation marks omitted)).[97] For these reasons, the Supreme Court has held that in a fraudulent inducement action like this one, the statute of "limitations does not start to run until *the fraud with respect to the contract is discovered or the exercise of reasonable diligence would discover it.*" *Hooks*, 457 S.W.3d at 57 (emphasis added); *accord Valdez*, 465 S.W.3d at 229; *see also S.V.*, 933 S.W.2d at 4-5 (discussing the discovery rule and fraudulent concealment and noting "we have deferred accrual of causes of action for limitations purposes . . . [in] those [actions] involving fraud and fraudulent concealment").

Critically, the determination of when a plaintiff actually discovered a fraud or would have upon reasonable diligence "*ordinarily present questions of fact for the factfinder, rather than matters of law for the court.*" *Ewers*, 695 S.W.3d at 622 (emphasis added) (citing *Sw. Energy Prod. Co.* v. *Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) ("reasonable

---

[97] *See also* Supp. C.R. 21 (MSJ Op. at 18 ("[B]ecause fraud is a type of injury to which the discovery rule categorically applies, the accrual date of Riverside's fraud and conspiracy claims is deferred until the discovery rule is negated.")).

diligence is an issue of fact"), and *Hooks*, 457 S.W.3d at 57-58 (noting that "reasonable diligence is an issue of fact")). Accordingly, unless reasonable minds cannot differ on these issues, they are for the factfinder to resolve and are not properly decided on summary judgment. *See Hooks*, 457 S.W.3d at 58 n.7 (collecting cases).

### C. The trial court erred in granting summary judgment because there are at minimum disputed issues of material fact as to when Riverside's claims accrued

#### 1. Riverside did not obtain actual knowledge of the True Health fraud until Grottenthaler pled guilty in 2024

Under these established limitations principles, the trial court's grant of summary judgment cannot stand. There can be no serious dispute that Riverside was defrauded: Appellees represented in the SPA that True Health was in material compliance with relevant healthcare laws, and True Health's former CEO and other company representatives have now admitted that during the relevant period True Health was knowingly violating federal kickback laws.[98]

Nor can there be any dispute that Appellees concealed this scheme from Riverside. As Riverside Managing Partner Hal Greenberg explains

---

[98] *See supra* pp. 23-24.

in his summary judgment affidavit—which must be credited for these purposes[99]—True Health and its officers repeatedly and explicitly represented that True Health was in compliance with all relevant healthcare laws and denied any improper conduct with MSOs whatsoever.[100] On that basis, Riverside not only made its initial $50 million investment, but continued to invest tens of millions in the company to keep it afloat—something it obviously would not have done had it had any concerns about True Health's compliance with anti-kickback laws. Riverside obtained actual knowledge of the misrepresentations in the SPA only when Grottenthaler and other representatives of True Health pled guilty in 2024—years after True Health's bankruptcy. *See Scott* v. *Carpenter*, 2022 WL 317060, at \*5 (Tex. App.—Waco Feb. 2, 2022, no pet.) (mem. op.) (reversing granting of summary judgment on statute of limitations defense where plaintiffs only obtained knowledge of misrepresentation years after it was made).

---

[99] *See Patton* v. *Harris Cnty. Cmty. Supervision & Corr. Dep't*, 2005 WL 3116405, at \*4 (Tex. App.—Houston [14th Dist.] Nov. 23, 2005, pet. denied) (mem. op.) ("[W]hen reviewing affidavits filed in opposition to summary judgment motions, the non-movant's affidavit should be accepted as true, and every reasonable inference should be drawn in favor of the non-movant.").

[100] C.R. 1732-1735 (Greenberg Affidavit ¶¶ 18, 20, 21).

### 2. The trial court erred in holding that Riverside had "inquiry notice" of the fraud as a matter of law as of April 2020

Tellingly, the trial court did not find that Riverside had actual knowledge of the fraud more than four years before it sued. Rather, the trial court based its summary judgment ruling on the theory that Riverside supposedly had "inquiry notice" of the fraud as of April 6, 2020[101]—holding that the supposed "history" of allegations of improper business practices by True Health, and the tying of those practices to True Health's economic losses, were sufficient to begin the accrual period on Riverside's claims as of April 2020.[102] This was error.

It was most fundamentally error because, as noted above, the determination as to when a plaintiff should have undertaken additional diligence—and what would have been discovered upon that diligence—"ordinarily present questions of fact for the factfinder, rather than matters of law for the court." *Ewers*, 695 S.W.3d at 622; *see supra* p. 38. They are therefore issues *not* properly determined on summary

---

[101] Supp. C.R. 0022-0025 (MSJ Op. at 19-22).

[102] Supp. C.R. 0024 (MSJ Op. at 21).

judgment—where all reasonable inferences must be resolved in the non-moving party's favor—because they raise fact issues.

This action presents a quintessential case for application of this principle. The trial court here did not hold that some singular known public fact or event put Riverside on notice of the fraud or otherwise resolved the statute of limitations issue as a matter of law. Rather, the trial court found the claims here time-barred only after assessing numerous historical events, and finding that only the accumulation of those events created a duty to conduct further investigation as of April 2020.[103] But that fact-laden assessment is properly the subject of the fact finder, at trial, on a full record, and with expert testimony on key issues, *not* on summary judgment—much less, as here, before any real discovery has taken place.

This case is nothing like those limited situations where issues of inquiry notice have been resolved on summary judgment. In those cases, there was "readily accessible and publicly available" information—like public real property or court records—that definitively established the defendant's wrongful behavior. *See, e.g.*, *Hooks*, 457 S.W.3d at 58-59

---

[103] *See* Supp. C.R. 0022-0025 (MSJ Op. at 19-22).

(internal quotation marks omitted) (discussing, among others, *BP Am. Prod. Co.*, 342 S.W.3d at 67-69, where two publicly available documents evidenced "that BP was not conducting good-faith continuous operations," and *Shell Oil Co.* v. *Ross*, 356 S.W.3d 924 (Tex. 2011), where publicly available "General Land Office records demonstrat[ed] that Shell paid higher royalties to the State even though it owed the Rosses the same royalty"); *see also Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc.* v. *Triex Tex. Holdings, LLC*, 659 S.W.3d 456 (Tex. 2023), cited at Supp. C.R. 0025 (breach of fiduciary duty action; at time of injury— *i.e.*, when counterparty defaulted on lease—plaintiff knew or should have known that broker's representation that "rent would be coming in every month without any issues or risk" was false, triggering statute of limitations). Nothing like those public records exists here evidencing the True Health fraud. The trial court's resolving the statute of limitations issue was improper fact finding pure and simple. It should be reversed on that basis alone.

In any event, the "facts" identified by the trial court leading up to and including the trustee notice were plainly insufficient to put Riverside on inquiry notice as a matter of law of the True Health rural hospital

fraud for which Grottenthaler pled guilty. A finding of inquiry notice requires that a plaintiff have knowledge of or access to facts sufficient to trigger a duty to investigate, and the ability to uncover, the wrongful conduct that is the subject of the plaintiff's claims. *See Ewers*, 695 S.W.3d at 623-24 (holding that appellants could not establish appellees' knowledge of injury-causing conduct because "[t]hough the appellees knew that purported payments from the . . . deal stopped in 2014, they did not know the payments stopped because [fraudster] had committed fraud, which was the injury-causing conduct for which they would later sue"). The wrongful conduct here concerned True Health's rural hospital kickback scheme involving the use of MSOs.

But, as set forth below, most of the "facts" relied on by the trial court had nothing to do with True Health's rural hospital business, or MSOs, or any kickback scheme, or any allegation of fraud. They provided Riverside with no notice whatsoever that True Health may have hidden from it at the time of the SPA improper kickbacks through the use of MSOs. And even where such a scheme was alleged, Riverside conducted appropriate diligence under the circumstances, but True Health's management, including Appellees, continued to affirmatively conceal the

fraud from it. At minimum, there are substantial issues of fact as to whether these circumstances were sufficient to put Riverside on inquiry notice of True Health's rural hospital fraud.

*Purchase of HDL Assets.* Prior to entering the SPA, Riverside knew that True Health had acquired the assets of HDL—a lab that had gone out of business as a result of healthcare violations.[104] True Health acquired those assets with the knowledge and authorization of the bankruptcy court, and it had expressly agreed to adopt the CIA that HDL had entered into with HHS OIG. Contrary to the trial court's suggestion, there was thus nothing nefarious about True Health's acquisition of those assets. And all evidence suggested that True Health remained in compliance with the CIA. Riverside thus had no reason to suspect that True Health's acquisition of HDL's assets had led to any improper business practices.[105] The trial court offered no basis to suggest otherwise.

---

[104] *See* Supp. C.R. 0022 (MSJ Op. at 19).

[105] The trial court noted that "the public accused True Health of continuing the same medically unnecessary testing that HDL had been shut down for." Supp. C.R. 0022 (MSJ Op. at 19). But the only "public accusation" cited by the trial court was a blog post from 2016. C.R. 1970-1974. HHS OIG thereafter raised no issues with True Health's continued certifications under the CIA. *See supra* pp. 14-15.

*Cigna and UnitedHealthcare Reimbursement Issues.* The trial court noted that, in 2016, both Cigna and UnitedHealthcare raised reimbursement issues with True Health.[106] These issues, however, had nothing to do with government reimbursements or True Health's rural hospital business, nor did the carriers raise any issue of fraud. Rather, United complained that True Health sought reimbursement for "'experimental' or 'unproven' healthcare procedures."[107] And True Health was able to quickly resolve the issues and entered into a new contract with United.[108] As to Cigna, the trial court noted only that "Cigna issued THD with a notice of claims review and audit."[109] It cited no evidence as to the reason for that review or its results—much less any evidence that Cigna had accused True Health of any illegal practices. It is thus not surprising that the trial court offered no reasoned basis why the United and Cigna reimbursement issues would have suggested to Riverside that

---

[106] Supp. C.R. 0008, 0022 (MSJ Op. at 5, 19).

[107] C.R. 2393 (Trustee Litigation, Defendant Larry R. Covert's Amended Traditional Motion for Partial Summary Judgment on Plaintiff's Breach-of-Fiduciary-Duty Claim at 7 (Sept. 6, 2022) ("Covert MSJ")).

[108] C.R. 2393-2394 (Covert MSJ at 7-8).

[109] Supp. C.R. 0008 (MSJ Op. at 5).

it needed to investigate any rural hospital kickback scheme involving MSOs.

*CMS Suspensions and DOJ CID.* The trial court also relied upon True Health's receipt of the DOJ CID and multiple suspensions from CMS. But the first CMS suspension notice identified only *eight* allegedly improper claims, out of the hundreds of thousands of lab tests True Health performed each year[110]—none of which concerned rural hospitals or any alleged relationships with MSOs. And the company fully investigated the relevant claims, told Riverside they were "frivolous," and rebutted them to CMS—with CMS later reducing the suspension from 100% to 35%. *See supra* p. 14. A later internal investigation by consulting firm Navigant showed a 0% error rate as to the medical necessity of the reviewed claims.[111] And at the same time, the HHS OIG had blessed True Health's compliance with the CIA. None of this suggests that Riverside was put on notice of illegal kickbacks by True Health or that Riverside was required as a matter of law to undertake additional diligence in response.

---

[110] C.R. 0439.

[111] C.R. 1897.

The trial court's reliance on the DOJ CID fails for similar reasons. Like CMS's suspension letter, the CID did not itself offer any evidence of fraud or other wrongful conduct on the part of True Health. While it made general reference to a False Claims Act investigation,[112] the CID did not specifically mention MSOs or True Health's rural hospital relationships (other than to ask whether True Health was located in or part of a rural hospital),[113] much less allege that True Health carried out any illegal conduct in connection with those relationships.

And in any event, True Health promptly hired outside counsel to respond to the CID, including by producing voluminous documents in response to the DOJ's requests. At no point did True Health or its counsel identify any documents or information uncovered during this response— either uncovered internally or provided by DOJ—suggesting that True Health was in material violation of healthcare laws. To the contrary, in early 2018, management expressly told the board that True Health did not undertake the activities focused on by DOJ.[114]

---

[112] C.R. 1837-1838.

[113] C.R. 1860.

[114] C.R. 1898; C.R. 1942-1943.

\*     \*     \*

It bears noting that in the trustee litigation, the trustee pointed to nearly all of the same facts relied on by the trial court—the purchase of the HDL assets, the public blog posts, the CMS suspension, and the DOJ CID—and alleged that those facts reflected "red flags" that put True Health's officers and directors on notice of the True Health fraud.[115] Appellees here, who were defendants in that litigation, vehemently denied that any of those events constituted such red flags in that litigation.[116] For example, Appellee Richard Covert, joined by Appellee De Leon, argued that the CID *could not* possibly constitute a "red flag" regarding potential wrongdoing at True Health, because, given the non-specific nature of the CID, "no reasonable board member could possibly discern what activities were being investigated" and therefore "it would have been impossible for him to determine whether, in fact, there might

---

[115] *See* C.R. 0929-0930 (Trustee Petition ¶¶ 82-85 (fallout of HDL purchase)); C.R. 0941 (Trustee Petition ¶ 129 (Cigna and UnitedHealth issues)); C.R. 0955 (Trustee Petition ¶ 189 (CID)); C.R. 0955-0956 (Trustee Petition ¶ 192 (CMS suspension)); C.R. 0961 (Trustee Petition ¶ 219 (pointing to "the many red flags indicating the D&O Defendants knew or should have known that violations of the law were occurring")); C.R. 2408-2409 (Covert MSJ at 22-23 (refuting trustee's use of the blog posts)).

[116] C.R. 2407-2413.

-49-

be ongoing improper or illegal activity."[117] The same reasoning applies to Riverside.

*Geren Declaration.* The trial court pointed to the Geren Declaration as "detailing the rural hospital and MSO schemes and providing specific facts that Riverside could have verified."[118] Unlike many of the other facts relied on by the trial court, the Geren Declaration did include allegations about a kickback scheme using MSOs. But Riverside diligently assessed the allegations, believed the declaration's supporting documentation to be taken entirely out of context, and determined the declaration to be, from Riverside's perspective, totally unreliable.[119] Appellee Osterhoff, True Health's general counsel, went so far as to call the information relied on by Geren "total garbage."[120] And both Osterhoff and True Health's outside counsel had previously represented to

---

[117] C.R. 2411-2412 (Covert MSJ at 25-26).

[118] Supp. C.R. 0023 (MSJ Op. at 20).

[119] C.R. 1736-1737 (Greenberg Affidavit ¶ 25).

[120] C.R. 1966.

Riverside that True Heath had never had *any* arrangements with MSOs.[121]

Indeed, while the government submitted the Geren Declaration in connection with its opposition to a temporary restraining order, the court ultimately granted the TRO. The government chose *not* to have Geren testify live at the later injunction hearing. And the bankruptcy court ultimately refused to order a stay of CMS's payments to True Health, finding that the Geren Declaration did not provide support of any ongoing fraudulent activity at True Health.[122] And the company continued to otherwise affirmatively deny that it was involved with MSOs or any of the other activity alleged by Geren.[123] Riverside thus reasonably concluded that the declaration did not provide a basis to think that True

---

[121] C.R. 1736 (Greenberg Affidavit ¶ 24); C.R. 1942 ("We also confirmed that True Health has no contracts, agreements or other arrangements with any MSO's [sic]."); C.R. 1948 ("THD did not do business with MSOs.").

[122] C.R. 2493 (Hearing Transcript at 39:21-24, *In re THG Holdings, LLC*, No. 19-11689 (Bankr. D. Del. Sept. 20, 2019) ("Even if I did accept that declaration I don't believe there is anything in there that Agent Garon [sic] said that would convince me that there is anything that has happened post-petition in terms of overpayment or fraud.")).

[123] C.R. 1740 (Greenberg Affidavit ¶ 30); C.R. 1943-1944.

Health had participated in illegal conduct prior to the SPA or that otherwise Riverside had been defrauded.[124]

*True Health's Bankruptcy.* The trial court also pointed to True Health's bankruptcy, in which Riverside lost nearly the entirety of its investment, suggesting that True Health's Chief Restructuring Officer, Clifford A. Zucker, "tied the bankruptcy to the CMS suspensions and improper business practices dating back to 2015."[125] But Zucker's declaration focused only on the CMS suspensions and the liquidity issues they created for True Health.[126] He did not identify any specific "improper business practices" by True Health, much less say anything about rural hospitals or MSOs, or even kickbacks more generally.[127]

*2020 Trustee Notice.* While the trial court cited the foregoing facts as giving Riverside notice of allegations of wrongdoing at True Heath, it did not hold that any of these events and circumstances on their own or even in the aggregate triggered a duty to investigate on the part of

---

[124] C.R. 1740 (Greenberg Affidavit ¶ 30).

[125] Supp. C.R. 0023 (MSJ Op. 20).

[126] C.R. 0865-0866.

[127] C.R. 0865-0867.

Riverside as a matter of law.[128] In the trial court's view, that time arose only when the liquidating trustee sent its notice of claim for damages to True Health's former officers and directors in April 2020.[129] But nothing about the trustee's notice of claim can reasonably be viewed as triggering a duty to investigate on the part of Riverside.

That is because nothing about the one-and-a-half-page trustee letter put Riverside on notice of the True Heath fraud, even when viewed in the context of the events that preceded it.[130] The letter did not mention True Health's rural hospitals business, or MSOs, or even kickbacks more generally.[131] It did not identify any particular improper business practices whatsoever.[132] The trustee simply alleged, in broad-brush fashion, that True Health's directors failed to properly oversee Grottenthaler's running of the business and to pursue a strategic course that would maximize True Health's value, resulting in its liquidation.[133]

---

[128] Supp. C.R. 0020-0021 (MSJ Op. 17-18).

[129] Supp. C.R. 0024 (MSJ Op. at 21).

[130] C.R. 0902-0903 (Notice of Claim at 1-2).

[131] C.R. 0902-0903.

[132] C.R. 0903 (making general reference to "legal entanglements with the United States Department of Justice and the Centers for Medicare and Medicaid Services").

[133] C.R. 0902-0903.

The trial court had no reasonable basis to find that the letter triggered some duty to investigate on the part of Riverside, when it made no mention of the schemes or practices that Riverside purportedly had a duty to look into.[134]

For these reasons, the trial court's determination that defendants established as a matter of law that on or before April 6, 2020, Riverside had a duty to further investigate the rural hospital fraud at True Health was error. Its granting of summary judgment on that basis should be reversed.

### 3. The trial court erred because there are at minimum disputed issues of material fact as to whether through a reasonable investigation Riverside could have uncovered the fraud

As the trial court acknowledged, even assuming Riverside had an obligation to make some investigation by April 6, 2020, defendants were still required to establish as a matter of law that a reasonable investigation by Riverside would have uncovered the fraud within four

---

[134] The trial court suggests that the notice letter gave Riverside particular reason to investigate any wrongdoing, because Riverside had "an overriding personal interest to investigate the allegations, if only to prepare a defense to the trustee's allegations." Supp. C.R. 0024 (MSJ Op. at 21). But this ignores that the trustee's "allegations" against True Health's directors—including the representatives of Riverside—concerned their oversight duties, *not* True Health's underlying business practices. It thus gave Riverside no reason to investigate True Health's rural hospital business.

years of that date.[135] The trial court found that defendants had done so,[136] based on the premise that the transactions and payments underlying the MSO fraud would have been reflected in True Health's business records and that Riverside had a right to investigate those records as of April 6, 2020.[137] But neither of those contentions was supported by the summary judgment record, much less as a matter of law.

As to Riverside's access to True Health's records, by April 2020 True Health had been liquidated and Riverside's equity interest in the company had been extinguished. As a result, and as set forth in the affidavit of Hal Greenberg,[138] it had *no* access to True Health's management or its books and records; those were in the control of the liquidating trust. Riverside thus had no ability to pore through True Health's records, including its payments, contracts, and communications, to try to uncover the fraud. Appellees offered no contrary evidence.[139]

---

[135] Supp. C.R. 0025 (MSJ Op. at 22).

[136] Supp. C.R. 0025 (MSJ Op. at 22).

[137] Supp. C.R. 0025-0026.

[138] The trial court was thus plainly wrong when it asserted that "Riverside makes no argument as to why it could not have found these records by April 6, 2024." Supp. C.R. 0026 (MSJ Op. at 23).

[139] The trial court suggests that Riverside could have accessed the records pursuant to 6 *Del. C.* § 18-305, a Delaware provision that allows LLC members to inspect certain LLC books and records under certain conditions. Supp. C.R. 0026 (MSJ Op.

The trial court's finding that "True Health's fraudulent schemes involved extensive transactions and payments, all of which would have been reflected in the business books and records" is similarly unsupported.[140] The summary judgment record includes *no* evidence as to what contemporaneous True Health documents and communications evidenced the MSO relationships and payments or other aspects of the fraud, much less how Riverside would have been able to obtain them. Indeed, in support of their motion, Appellees cited not a single contemporaneous record from True Health's files showing the MSO fraud. They relied entirely on after-the-fact allegations.

Not surprisingly, the trial court's opinion cited no such contemporaneous records either. It instead cited only the petition's recitation of Grottenthaler's guilty plea.[141] But Grottenthaler's plea said nothing as to how the transactions and payments were documented, much less that those transactions and payments would have been readily identifiable in True Health's records. Indeed, as set forth in the

---

at 23). But the trial court does not explain how it could have done so, given True Health's liquidation, nor does it explain how Riverside would have uncovered the fraud through the corporate records available through § 18-305.

[140] Supp. C.R. 0026 (MSJ Op. at 23).

[141] Supp. C.R. 0026 (MSJ Op. at 23 (citing Original Petition ¶ 81)).

Grottenthaler indictment, it was the *third-party* hospitals, through recruiters they hired, that funded the MSOs to make the kickback payments to providers, not True Health. *See supra* pp. 23-24. The trial court thus had no basis to find that the fraud could have been uncovered by a review solely of True Health's records—even assuming (counterfactually) that Riverside had access to them.[142]

Similarly unsupported is the trial court's suggestion that because the liquidating trust and DOJ were able to bring suit in 2021 and 2022, respectively, Riverside too could have uncovered the fraud by that time.[143] The trial court ignores that those third parties had access to far more information and to far more methods of investigation than True

---

[142] The trial court went so far as to suggest that the Little River agreement itself outlines the fraudulent activities. Supp. C.R. 0025-0026 (MSJ Op. at 22-23 ("LRH agreement explicitly outlines the fraudulent activities, including the MSO and rural hospital schemes, and establishes that the improper business practices predated the SPA.")). That contention is baseless, and the trial court offered no evidence for it. The Little River contract was not even in the summary judgment record. The court instead just cited the petition, which did not remotely suggest that the Little River agreement itself outlined the rural hospital fraud. The petition alleged only that "[p]er the agreement, LRH would pay THD for performing tests on specimens sent to it by LRH, while THD would allow Little River to bill the tests to any public or private insurer" and that only as Riverside would learn later, the agreement facilitated fraud. C.R. 0046-0047 (Original Petition ¶¶ 57-58). The petition did not allege that the agreement referenced using MSOs to pay kickbacks to providers or allowed Little River to fraudulently submit claims as "outpatient" services. Indeed, the Little River contract did not even identify how Little River would bill for its claims. C.R. 1942.

[143] Supp. C.R. 0026-0027 (MSJ Op. at 23-24).

Health. The liquidating trust controlled True Health and its books and records and it had access to third-party discovery through the bankruptcy process. DOJ's investigatory powers and resources are vast, including the power to issue CIDs to any party of its choosing to compel information about the rural hospital kickback scheme. Even with its powers and expertise, the DOJ took six years to investigate True Health after the 2015 qui tam complaint before the DOJ intervened in the suit.

Riverside in contrast had none of these powers and no ability to conduct on its own remotely similar investigations. And even with these powers, it took the liquidation trust and DOJ *years* before they had sufficient information to bring suit. None of this remotely suggests that there exist no issues of material fact as to whether Riverside could have uncovered the fraud with the limited documents and information available to it. Again, the trial court's finding to the contrary as a matter of law was error.

### D. The trial court erred in finding that Riverside failed to raise a material issue of disputed fact as to fraudulent concealment

As the trial court acknowledges, under the doctrine of fraudulent concealment, even if the statute of limitations had accrued as of April 2020, the statute of limitations would be further tolled for the period

when defendants affirmatively concealed their wrongdoing.[144] This rightly prevents defendants from benefitting from their own fraud. *See supra* pp. 37-38.

The trial court held the doctrine inapplicable here, because Riverside supposedly did not "argue defendants concealed anything from them after April 6, 2020."[145] This too was error.

The trial court erroneously focused its fraudulent concealment analysis on the period on or after April 2020. It therefore ignored that prior to that time, Appellees and their representatives had affirmatively concealed from Riverside that True Health was involved with MSOs or otherwise participated in any of the practices alleged by DOJ.[146] Those misrepresentations continued to conceal the fraud from Riverside well after April 2020.

For example, in early 2018, in a legal update to the board, Appellee Osterhoff, True Health's general counsel, expressly represented that

---

[144] Supp. C.R. 0019-0020 (MSJ Op. at 16-17).

[145] Supp. C.R. 0028 (MSJ Op. at 25).

[146] *See, e.g.*, C.R. 1732 (Greenberg Affidavit ¶ 18); C.R. 1943-1944; C.R. 1948 (noting after True Health was able to review the qui tam complaint that "[u]pon review of the allegations in the complaint, THD is of the view that those claims lack merit, and that some are improperly or fraudulently alleged").

True Health did not undertake the activities focused on by DOJ: kickbacks to referring physicians.[147] And later in 2018, when DOJ raised questions about True Health's relationships with MSOs and rural hospitals, Riverside received a detailed analysis expressly denying that True Health used MSOs or was aware of any improper billing by rural hospitals to CMS. That analysis went so far as to represent that Appellee Grottenthaler and other True Health employees would be willing to confirm those facts via sworn certifications.[148] And when Geren submitted his declaration in connection with True Health's action against CMS, Osterhoff and others continued to deny that True Health undertook any of the practices being alleged. *See supra* pp. 17-18.

Riverside reasonably relied on these representations,[149] and Appellees never retracted them. The rural hospital fraud thus remained hidden from Riverside up to and after April 2020 as a result of Appellees'

---

[147] C.R. 1898.

[148] C.R. 1935.

[149] The trial court dismisses these representations on the grounds that Osterhoff and True Health's outside counsel represented the company, not Riverside. Supp. C.R. 0024-0025 (MSJ Op. at 21-22). This misses the point. Greenberg and other Riverside representatives were directors of True Health and had a right to rely on the representations of the company's counsel. C.R. 1724-1726 (Greenberg Affidavit ¶¶ 7-8).

specific acts of concealment. As noted in the affidavit of Hal Greenberg, Riverside did not obtain knowledge of the fraud until Grottenthaler entered his guilty plea—in 2024.[150] There are thus plainly disputed issues of material fact as to whether tolling under fraudulent concealment applies. Summary judgment was improper for this further reason.

E. **In the alternative, the trial court should have granted a continuance pending completion of fact discovery**

For the reasons stated above, the motion should have been denied. At minimum, however, the motion should have been continued until the end of fact discovery. It is well-established that "[r]aising a limitations defense through a traditional motion for summary judgment requires more effort and allows more risk of procedural problems." *Scott*, 2022 WL 317060, at *2. Such is the case here: as detailed above, much of the fraudulent conduct was perpetrated by defendants in this matter who neither provided document discovery nor were deposed. And fact discovery on these issues is deeply intertwined with Riverside's underlying claims, in that both involve highly fact-intensive inquiries

---

[150] C.R. 1742 (Greenberg Affidavit ¶ 34).

-61-

into True Health's violations of healthcare laws and Appellees' concealment of that wrongful conduct. The trial court should have at minimum allowed the matter to proceed through fact discovery, at which point the parties could have presented the issues raised on the motion on a complete record.

## II. THE TRIAL COURT ERRED IN GRANTING THE SPECIAL APPEARANCES

### A. Nearly all of the Specially Appearing Appellees waived their right to contest personal jurisdiction in this matter by appearing generally in the trustee litigation

All but three of the Specially Appearing Appellees were sued in the trustee litigation and filed general appearances in that case. Because the trustee litigation and this case both arise from the same transaction—namely, True Health's illegal business practices and the false representations True Health affiliates made about those practices in the recapitalization—these Specially Appearing Appellees waived their right to contest personal jurisdiction below through their prior general appearances, and the trial court erred in holding otherwise.

"[T]he personal jurisdiction requirement is a waivable right [and] there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (internal quotation marks omitted). Such a waiver can occur when a defendant "voluntarily appear[s] and ch[ooses] to litigate claims arising from . . . [a] transaction" in Texas. *Primexx Energy Opportunity Fund, LP* v. *Primexx Energy Corp.*, 2025 Tex. Bus. 5, 2025 WL 446345, at *9 (Tex. Bus. Ct.

Feb. 10, 2025); *see also Mass. Bay Ins. Co.* v. *Adkins*, 615 S.W.3d 580, 600 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding where a defendant filed a general appearance in a case that had been transferred to a different court, "[w]hat is relevant is that, by filing its answer, unconditioned by a special appearance, [the defendant] acknowledged that the case was properly pending before *a Texas court*").

Here, there can be little doubt that this action and the trustee litigation arise out of the same transactions.[151] Like Riverside in this action, the liquidating trustee alleged that True Health's creditors had been fraudulently induced to invest in the recapitalization through false representations "that True Health's business and the sales of tests by its employees were conducted in accordance with the [Anti-Kickback Statute] and other healthcare laws (when in fact they were not)."[152] Like Riverside, the trustee grounded this fraud claim in True Health's improper kickback schemes involving rural hospitals and MSOs.[153] By

---

[151] Notably, in their summary judgment motion, the De Leon Appellees acknowledged that the trustee litigation was "based on the same underlying theory [as this case—]the failure to disclose health care violations in conjunction with the loans associated with the execution of the [SPA]." C.R. 0216-0217.

[152] C.R. 0933 (Trustee Petition ¶ 92); *see also* C.R. 0976-0977 (Trustee Petition ¶¶ 322-337 (relevant fraud by omission claim)).

[153] C.R. 0931-0932 (Trustee Petition ¶ 91).

filing general appearances in the trustee litigation, the relevant Specially Appearing Appellees thus conceded that claims relating to the recapitalization and True Health's historical MSO fraud are properly litigated in Texas courts.

The trial court nonetheless found that the Specially Appearing Appellees had not waived jurisdiction, on the "premise 'that a foreign defendant [does not] waive[] its right [to] object to personal jurisdiction, or consent[] to jurisdiction, in Texas by having defended other lawsuits in Texas.'"[154] But that general principle of law has no application here. The Specially Appearing Appellees did not previously choose to appear in some "other lawsuit" in Texas. Rather, they agreed to the jurisdiction of the Texas courts over a case involving the very same subject company, recapitalization transaction, business practices, and allegations of fraud as this one. The case cited by the trial court is thus entirely inapposite. *See Megadrill*, 556 S.W.3d at 498 (rejecting an argument for personal jurisdiction by consent based on prior lawsuits where the prior claims asserted were "entirely unrelated to [that] lawsuit").

---

[154] C.R. 2998-2999 (Special Appearances Op. at 35-36 (quoting *Megadrill Servs. Ltd.* v. *Brighouse*, 556 S.W.3d 490, 498 (Tex. App.—Houston [14th Dist.] 2018, no pet.))).

The trial court nonetheless rejected the waiver argument because the trustee litigation involved additional subject matters and claims. It is true that the liquidating trustee brought claims for breach of fiduciary duty and fraudulent transfer (among others), not just for fraud. And it is true that the trustee's allegations concerned improper business practices beyond those alleged in the petition.[155] But that is irrelevant for purposes of the waiver analysis. The critical fact as to waiver is that, as the trial court concedes, "many of the claims [in the trustee litigation] are based on the same or similar allegations" as here—namely, fraud claims arising out of True Health's rural hospital business.[156] The Specially Appearing Appellees agreed that the Texas courts were the proper jurisdiction to hear those claims in the trustee litigation. *Cf. Mass. Bay Ins. Co.*, 615 S.W.3d at 599-600 ("The purpose of a special appearance, however, is to contest the ability of *all courts in the forum state*—not a particular district court—to exercise personal jurisdiction over a defendant." (emphasis added)). They cannot now be heard to contest the jurisdiction of the Texas courts over nearly identical claims in this case. Those

---

[155] C.R. 2999 (Special Appearances Op. at 36).

[156] C.R. 2999 (Special Appearances Op. at 36).

arguments have been waived. The trial court's contrary finding was error.[157]

## B. The Specially Appearing Appellees had substantial contacts with Texas

Even putting aside waiver, each of the Specially Appearing Appellees also had substantial contacts with Texas such that exercising personal jurisdiction over them here comports with due process.

Because Texas's long-arm statute "reaches as far as the federal constitutional requirements for due process will allow," *State* v. *Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023), to assess whether they have jurisdiction over a nonresident defendant, courts need "only analyze whether [the defendant]'s acts would bring [the defendant] within Texas' jurisdiction consistent with constitutional due process," *Retamco Operating, Inc.* v. *Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). "A state's exercise of jurisdiction comports with

---

[157] The trial court also credited the Specially Appearing Appellees' "argument that the Trustee Litigation arose at least in part out of the THG LLC Agreement" and thus that the agreement's "mandatory venue provision arguably foreclosed those defendants' ability to object to jurisdiction in that case . . . [which] weighs against finding waiver here, where the LLC Agreement does not apply." C.R. 2999-3000 (Special Appearances Op. at 36-37). But the Specially Appearing Appellees offered no evidence showing that they appeared in the trustee litigation only because of the LLC agreement, and the trial court cited no record evidence for that proposition.

federal due process if (i) the nonresident defendant has 'minimum contacts' with the state and (ii) the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Primexx Energy Opportunity Fund, LP*, 2025 Tex. Bus. 5, 2025 WL 446345, at *5 (quoting *M&F Worldwide Corp.* v. *Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017)).

A nonresident defendant has minimum contacts with Texas "when (1) the defendant engages in some act by which it purposefully avails itself of the privilege of conducting activities within the . . . state and (2) the plaintiff's claims arise out of or relate to those forum contacts." *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 412-13 (cleaned up). The Specially Appearing Appellees' contacts with Texas plainly meet this standard.[158]

The Specially Appearing Appellees knowingly invested in an enterprise with Texas headquarters and substantial Texas operations,

---

[158] The trial court concluded that it did not need to consider jurisdictional allegations made in Riverside's response to the special appearances under its reading of *Kelly* v. *General Interior Construction, Inc.* C.R. 2981-2984. This Court adopted the same reading of *Kelly* in *State* v. *Yelp, Inc.*, while noting that Texas appellate courts have split on this issue. 2025 WL 2936466, at *3-6 & n.2 (Tex. App.—15th Dist. Oct. 16, 2025, no pet. h.). Riverside is prepared to amend its petition on remand to allege the jurisdictional contacts discussed herein.

including the very operations that formed the core of the fraudulent scheme Riverside alleged in its petition, *i.e.*, True Health's relationships with Texas rural hospitals. All but three of the Specially Appearing Appellees admitted in jurisdictional discovery that they knew about True Health's business in the state.[159]

Four of those Appellees had even stronger connections to the company's Texas operations. Appellee Carol Nellis was a True Health Vice President who traveled weekly to Texas for company business, listed the company's Frisco, Texas address in her email signature line around the time the SPA was executed, and spoke regularly to individuals located in Texas, including physicians.[160] Appellee Wippman was a True Health director who traveled to Texas for board meetings and provided the company with legal advice.[161] Appellee Richards was True Health's Chief Financial Officer who worked out of the company's Texas headquarters for most of 2015, including during the period for which Grottenthaler admitted that the kickback conspiracy was underway as

---

[159] C.R. 2579-2580 (Appellants' Supplement to Response to Special Appearances at 16-17 ("Supplemental Response")).

[160] C.R. 1395; C.R. 2616-2617.

[161] C.R. 2623.

part of his guilty plea.[162] And, as noted, Appellee Osterhoff was True Health's general counsel who oversaw the company's legal compliance—including as to its Texas operations—communicated with Riverside about those in-state operations, and traveled to Texas for this work.[163]

And the Specially Appearing Appellees also profited handsomely from the Company's Texas operations, earning tens of millions of dollars in total through the recapitalization after having defrauded Riverside with their representations about True Health's in-state operations in the SPA.[164] The Specially Appearing Appellees' contacts were thus far from "random, isolated, or fortuitous," but were rather the result of a conscious decision each of them made to invest in a company with substantial Texas operations and to then make representations about those operations to Riverside to cash out on that investment. *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 420 (internal quotation marks omitted).

---

[162] C.R. 2066-2067; C.R. 2632.

[163] C.R. 2600; C.R. 2603.

[164] C.R. 0033 (Original Petition ¶ 2).

Appellees' contacts with Texas are only reinforced by their conduct in the recapitalization. "At its core, the purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Moncrief Oil Int'l Inc.* v. *OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013).

Here, the Specially Appearing Appellees designated a Texas-based entity managed by Appellee Grottenthaler, Appellee CLG Investments, LLC, as their agent and attorney-in-fact under the SPA.[165] And in connection with the recapitalization these Appellees signed a True Health LLC agreement the same day as the SPA in which each signatory broadly waived the right to contest personal jurisdiction in Dallas courts for actions arising out of that agreement.[166] The SPA references that 2017 LLC agreement on its very first page and includes the contract as an exhibit to the agreement.[167] The Specially Appearing Appellees' agreement to the 2017 LLC agreement's jurisdictional provision in

---

[165] C.R. 1782 (SPA § 6.1).

[166] C.R. 1492 (2017 True Health Group, LLC Limited Liability Company Agreement § 10.5(a)).

[167] C.R. 1750 (SPA at 1).

connection with the recapitalization illustrates that it would have been patently reasonable for them to anticipate being haled into a Texas court for claims regarding the recapitalization.

Even were each of these contacts insufficient on their own to establish jurisdiction, in the aggregate they show that the Specially Appearing Appellees had purposeful and substantial contacts with Texas as True Health investors that bore directly on the fraud they perpetrated on Riverside. *See Lobell* v. *Cap. Transp., LLC*, 2015 WL 9436255, at *6 (Tex. App.—Austin Dec. 15, 2015, no pet.) (mem. op.) (affirming the denial of a special appearance where the "pleadings and evidence show that [the defendant]'s contacts with Texas . . . were taken in an effort by [the defendant] to avail himself of the privilege of conducting business in Texas by establishing an ongoing relationship with and obligations to Texas residents in order to profit from a business operated out of Texas"). And, as discussed above, nearly all of them then decided to file general appearances in the trustee litigation, thereby admitting that Texas is a proper forum for litigation over the recapitalization.

## C. The trial court erred by failing to consider Appellees' Texas contacts in their totality and in its analysis of the contacts' relatedness to this lawsuit

The trial court nonetheless found that the Specially Appearing Appellees lacked minimum contacts with Texas. That determination does not withstand scrutiny. First, the trial court erred by analyzing the proffered contacts in isolation, assessing individually whether the Appellees' contacts with Texas were sufficient to establish jurisdiction.[168] But "[i]n deciding a special appearance, [a court] must avoid a divide and conquer approach to minimum contacts and should instead consider contacts in their totality." *Procarsa S.A. de C.V.* v. *Blue Racer Midstream LLC*, 2024 WL 5066084, at \*5 (Tex. App.—Dallas Dec. 11, 2024, no pet.) (mem. op.) (internal quotation marks omitted) (collecting cases). The trial court failed to do so here. That alone warrants a remand.

Second, the trial court incorrectly framed Riverside's argument as to the 2017 LLC agreement as being solely about application of the agreement's forum-selection clause.[169] Relying on that framing, the trial

---

[168] *See* C.R. 2989 (Special Appearances Op. at 26); C.R. 2991 (Special Appearances Op. at 28); C.R. 2994 (Special Appearances Op. at 31).

[169] C.R. 2986 (Special Appearances Op. at 23); *see* C.R. 1065 (Appellants' Response to Special Appearances at 21 & n.43 (Apr. 28, 2025) (listing the 2017 LLC agreement as a contact with Texas)).

court found that "[t]his case does not arise out of the 2017 THG LLC Agreement" and thus that contract's forum provision clause did not apply.[170] But that analysis misses Riverside's broader point about the relevance of the LLC agreement.

As part of the LLC agreement, the Specially Appearing Appellees consented to the jurisdiction of Dallas courts for claims arising out of that agreement[171]—confirming the connection between the Texas forum and their investment in True Health. That LLC agreement was an exhibit to, and was signed the same day as, the SPA. Not surprisingly, nearly all of the Specially Appearing Appellees admitted that they signed the LLC agreement and its jurisdictional provision in connection with the recapitalization.[172] The LLC agreement and SPA are thus inextricably linked. Accordingly, irrespective of whether the agreement's forum selection and jurisdiction provisions apply as a matter of contract to the claims asserted here, the Specially Appearing Appellees' consenting to jurisdiction as part of the LLC agreement in connection with the SPA and

---

[170] C.R. 2995-29976 (Special Appearances Op. at 32-33).

[171] C.R. 1492.

[172] C.R. 2579-2580 (Supplemental Response at 16-17 (July 10, 2025) (chart reflecting that all but one of the Specially Appearing Appellees admitted to having signed the 2017 LLC agreement in connection with the recapitalization)).

broader recapitalization is a further indication that they could reasonably anticipate answering a case in a Texas court concerning those transactions. There is thus nothing unfair about requiring the Specially Appearing Appellees to defend their conduct in the recapitalization in a Texas court.

Third, the trial court erred in concluding that "there is no substantial connection between . . . defendants' investment in THG . . . and the operative facts of this litigation" because "Riverside's claims arise out of their investment in THG and alleged fraud in the SPA."[173] The "relatedness inquiry requires only that the suit arise out of or relate to the defendant's contact with the forum." *Yelp, Inc.*, 2025 WL 2936466, at *10 (citing *Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). Here, Riverside's suit plainly relates to Appellees contacts with the forum, including their investment in True Health. Appellees signed the SPA expressly because they were True Health's significant equityholders—that is, by virtue of their investments in the company. The Appellees' investments in True Health and Riverside's claims arising out of the SPA go hand in hand. And Appellees chose to

---

[173] C.R. 2988 (Special Appearances Op. at 25).

make extensive representations in that contract about True Health's business operations in Texas, including the very representations about healthcare law compliance through which Riverside was defrauded, to obtain distributions on their equity. That is plainly sufficient to create a nexus between Appellees' Texas contacts and this action.

For the foregoing reasons, the trial court's grant of the Specially Appearing Appellees' special appearances should be reversed.

## PRAYER

For the reasons set forth herein, Appellants respectfully request that the Court reverse the trial court's granting of summary judgment in favor of Appellees and granting of the special appearances, and award Appellants their costs and expenses of this appeal.

Dated: December 10, 2025     Respectfully submitted,

_____

**ROGGE DUNN**
State Bar No. 06249500
Email: Dunn@RoggeDunnGroup.com

**HARVEY G. JOSEPH**
State Bar No. 11027850
Email: Joseph@RoggeDunnGroup.com

**LANE M. WEBSTER**
State Bar No. 24089042
Email: Webster@RoggeDunnGroup.com

**ROGGE DUNN GROUP, PC**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile: (214) 220-3833

**WILLIAM SAVITT**
Email: WDSavitt@wlrk.com

**ADAM M. GOGOLAK**
Email: AMGogolak@wlrk.com

**MICHAEL S. AVI-YONAH**
Email: MSAviYonah@wlrk.com

**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

**ATTORNEYS FOR APPELLANTS**

-77-

## CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the above and foregoing instrument was served on the Parties' counsel of record pursuant to the Rules on this 10th day of December, 2025.

ROGGE DUNN
HARVEY G. JOSEPH
LANE M. WEBSTER

## CERTIFICATE OF COMPLIANCE

Based on a word count, Appellants' brief contains 14,172 words, excluding the portions of the document exempt from the word count under Rule 9.4(i)(1).

ROGGE DUNN
HARVEY G. JOSEPH
LANE M. WEBSTER

# NO. 15-25-00137-CV

# IN THE COURT OF APPEALS

# FOR THE FIFTEENTH APPELLATE DISTRICT OF TEXAS

---

**RIVERSIDE STRATEGIC CAPITAL FUND I, L.P., RSCF BLOCKER TRUE HEALTH, LLC, RSCF I-A BLOCKER TRUE HEALTH, LLC,**

*Appellants,*

**v.**

**CLG INVESTMENTS, LLC, ET AL.,**

*Appellees.*

---

**On Appeal from the Business Court of Texas, First Division (1B)**
**Trial Court Case No. 25-BC01B-0006**
**Hon. Bill Whitehill, Presiding**

---

# APPENDIX

---

| EX. | DESCRIPTION |
|-----|-------------|
| 1. | Order *Nunc Pro Tunc* on Summary Judgment (July 10, 2025) (C.R. 2742-2744) |
| 2. | Order on Special Appearances (July 17, 2025) (C.R. 2935-2937) |
| 3. | Final Judgment (Aug. 18, 2025) (C.R. 2959-2962) |

| 4. | Memorandum Opinion on Special Appearances (Aug. 19, 2025) (C.R. 2964-3000) |
| --- | --- |
| 5. | Opinion on Summary Judgment (Sept. 17, 2025) (Supp. C.R. 0003-0029) |

# EXHIBIT 1



The Business Court of Texas,
1st Division

RIVERSIDE STRATEGIC CAPITAL
FUND I, L.P.; RSCF BLOCKER
TRUE HEALTH, LLC; and RSCF I-A
BLOCKER TRUE HEALTH, LLC,
*Plaintiffs*,

v.

CLG INVESTMENTS, LLC;
CHRISTOPHER
GROTTENTHALER; COVERT
INVESTMENT OPERATIONS, LLC;
TRUE HEALTH DIAGNOSTIC
MANAGEMENT LLC; L. RICHARD
COVERT; LCG VENTURES II, LLC;
FERNANDO DE LEON; TIMOTHY
TATROWICZ ALBA DURATA,
LLC; TOM D. WIPPMAN, in his
capacity as TRUSTEE OF THE TOM
D. WIPPMAN REVOCABLE
TRUST; MARK THOMAS SMITH;
ALEXANDRA NETTESHEIM;
KYLE NETTESHEIM; ROBERT J.
OSTERHOFF; RJ INVESTMENTS;
MATT MILBURN; MICHAEL A.
CLEMENTS; MICHAEL
OSTERHOFF; MELINDA L.
MILBURN; KAREN A. MILLER;
JACK NOVAK; EDWARD MCCAN;

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Cause No. 25-BC01B-0006

2742

| DANIEL GROTTENTHALER; | § |
| ANITA GROTTENTHALER; DANA | § |
| M. HOVIND; CHRISTIAN | § |
| RICHARDS; CHRISTOPHER W. | § |
| KLING; in his capacity as TRUSTEE | § |
| OF CHRISTOPHER W. & MARISSA | § |
| M. KLING REV TRUST U/A/D | § |
| 5/11/2012; KEVIN M. NELLIS; | § |
| CAROL A. NELLIS; BRUCE | § |
| ZIVIAN; RYAN NELLIS; and | § |
| ANCELMO E. LOPES, *Defendants* | § |

## ORDER NUNC PRO TUNC

Before the court is the April 4, 2025, Motion for Summary Judgment by Fernando De Leon, LCG Ventures, LLC, LCG Ventures II, LLC, and Leon Capital Partners, LLC and the May 27, 2025, joinder in that motion by CLG Investments, LLC, Christopher Grottenthaler, Covert Investment Operations, LLC, True Health Diagnostic Management, LLC, Richard Covert, Timothy Tatarowicz, Alba Durata, LLC, Melinda Milburn, Jack Novak, and Dana Hovind. Having considered the pleadings, plaintiffs' response and their motion for continuance, the summary judgment evidence, and the parties' briefing and oral argument heard on July 3, 2025, the court concludes as follows:

2743

Defendants conclusively established that all of plaintiffs' causes of action accrued no later than December 6, 2019—when the related bankruptcy proceedings were substantially consummated (Pet. ¶ 77)—more than for years before the filing of this action. Therefore, all of plaintiffs' claims against the above-listed defendants are barred under the applicable statutes of limitations.

Further, plaintiffs did not raise a genuine issue of material fact concerning fraudulent concealment after that date. Therefore, the statutes of limitations were not tolled between that date and the filing of this action.

Additionally, plaintiffs did not carry their burden of establishing grounds supporting their motion for continuance.

Accordingly, because December 6, 2019, is more than four years before this lawsuit was filed on January 23, 2025, causes of action against the above-listed defendants are barred by the applicable statutes of limitations and are dismissed with prejudice.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  July 10, 2025

2744

# EXHIBIT 2



The Business Court of Texas,
1st Division

RIVERSIDE STRATEGIC CAPITAL
FUND I, L.P.; RSCF BLOCKER
TRUE HEALTH, LLC; and RSCF I-A
BLOCKER TRUE HEALTH, LLC,
*Plaintiffs*,

v.

CLG INVESTMENTS, LLC;
CHRISTOPHER
GROTTENTHALER; COVERT
INVESTMENT OPERATIONS, LLC;
TRUE HEALTH DIAGNOSTIC
MANAGEMENT LLC; L. RICHARD
COVERT; LCG VENTURES II, LLC;
FERNANDO DE LEON; TIMOTHY
TATROWICZ ALBA DURATA,
LLC; TOM D. WIPPMAN, in his
capacity as TRUSTEE OF THE TOM
D. WIPPMAN REVOCABLE
TRUST; MARK THOMAS SMITH;
ALEXANDRA NETTESHEIM;
KYLE NETTESHEIM; ROBERT J.
OSTERHOFF; RJ INVESTMENTS;
MATT MILBURN; MICHAEL A.
CLEMENTS; MICHAEL
OSTERHOFF; MELINDA L.
MILBURN; KAREN A. MILLER;
JACK NOVAK; EDWARD MCCAN;

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Cause No. 25-BC01B-0006

2935

DANIEL GROTTENTHALER;    §
ANITA GROTTENTHALER; DANA    §
M. HOVIND; CHRISTIAN    §
RICHARDS; CHRISTOPHER W.    §
KLING; in his capacity as TRUSTEE    §
OF CHRISTOPHER W. & MARISSA    §
M. KLING REV TRUST U/A/D    §
5/11/2012; KEVIN M. NELLIS;    §
CAROL A. NELLIS; BRUCE    §
ZIVIAN; RYAN NELLIS; and    §
ANCELMO E. LOPES, *Defendants*    §

## ORDER

Before the court is the March 31, 2025, Special Appearance of Defendants Tom Wippman, Mark Thomas Smith, Alexandra Nettesheim, Kyle Nettesheim, Robert Osterhoff, RJ Investments, Matt Milburn, Michael Clements, Michael Osterhoff, Karen Miller, Edward McCann, Daniel Grottenthaler, Anita Grottenthaler, Christian Richards, Christopher Kling, Kevin Nellis, Carol Nellis, Bruce Zivian, Ryan Nellis, and Ancelmo E. Lopes (Out-of-State Defendants). The court considered the pleadings, the briefing, the evidence on file, and oral argument heard on July 15, 2025.

Based on the above, the court grants the Out-of-State Defendants' Special Appearance and dismisses the claims against them.

So ORDERED.

2

2936

Opinion to follow.

_BillWhitehill_
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  July 17, 2025

3

# EXHIBIT 3

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
8/18/2025

2959



The Business Court of Texas,
1st Division

| RIVERSIDE STRATEGIC CAPITAL FUND I, L.P.; RSCF BLOCKER TRUE HEALTH, LLC; and RSCF I-A BLOCKER TRUE HEALTH, LLC, *Plaintiffs*, | § § § § § § | |
|---|---|---|
| | § | Cause No. 25-BC01B-0006 |
| v. | § | |
| CLG INVESTMENTS, LLC; CHRISTOPHER GROTTENTHALER; COVERT INVESTMENT OPERATIONS, LLC; TRUE HEALTH DIAGNOSTIC MANAGEMENT LLC; L. RICHARD COVERT; LCG VENTURES II, LLC; FERNANDO DE LEON; TIMOTHY TATROWICZ ALBA DURATA, LLC; TOM D. WIPPMAN, in his capacity as TRUSTEE OF THE TOM D. WIPPMAN REVOCABLE TRUST; MARK THOMAS SMITH; ALEXANDRA NETTESHEIM; KYLE NETTESHEIM; ROBERT J. OSTERHOFF; RJ INVESTMENTS; MATT MILBURN; MICHAEL A. CLEMENTS; MICHAEL OSTERHOFF; MELINDA L. MILBURN; KAREN A. MILLER; | § § § § § § § § § § § § § § § § § § § § § | |

JACK NOVAK; EDWARD MCCAN; §
DANIEL GROTTENTHALER; §
ANITA GROTTENTHALER; DANA §
M. HOVIND; CHRISTIAN §
RICHARDS; CHRISTOPHER W. §
KLING; in his capacity as TRUSTEE §
OF CHRISTOPHER W. & MARISSA §
M. KLING REV TRUST U/A/D §
5/11/2012; KEVIN M. NELLIS; §
CAROL A. NELLIS; BRUCE §
ZIVIAN; RYAN NELLIS; and §
ANCELMO E. LOPES, *Defendants*

---

**FINAL JUDGMENT**

---

The court issued a July 10, 2025, Order Nunc Pro Tunc granting defendants Fernando De Leon, LCG Ventures, LLC, LCG Ventures II, LLC, and Leon Capital Partners, LLC's Motion for Summary Judgment.[1]

On July 17, 2025, the court granted defendants Tom Wippman, Mark Thomas Smith, Alexandra Nettesheim, Kyle Nettesheim, Robert Osterhoff, RJ Investments, Matt Milburn, Michael Clements, Michael Osterhoff, Karen Miller, Edward McCann, Daniel Grottenthaler, Anita Grottenthaler, Christian Richards, Christopher Kling, Kevin Nellis, Carol Nellis, Bruce Zivian,

---

[1] Defendants CLG Investments, LLC, Christopher Grottenthaler, Covert Investment Operations, LLC, True Health Diagnostic Management, LLC, Richard Covert, Timothy Tatarowicz, Alba Durata, LLC, Melinda Milburn, Jack Novak, and Dana Hovind joined in that motion before it was decided.

2

2960

Ryan Nellis, and Ancelmo E. Lopes's (Out-of-State Defendants) Special Appearance.

Those two orders disposed of all parties and all causes of action.

It is, therefore, ORDERED, Adjudged, and Decreed that this court lacks personal jurisdiction over the Out-of-State Defendants for the reasons to be stated in the court's forthcoming opinion. Thus, the court dismisses plaintiffs' causes of action against the Out-of-State Defendants without prejudice.

It is further ORDERED, Adjudged, and Decreed that the court dismisses with prejudice all causes of action against the remaining defendants.

This Final Judgment finally disposes of all claims, causes of action, and parties before the court.

To the extent not addressed herein or in a prior order of the court, all relief requested by plaintiffs is denied.

Costs are taxed against the party that incurred them.

This judgment is final and appealable.

2961

So ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  August 18, 2025

4

# EXHIBIT 4

2025 Tex. Bus. 33



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| RIVERSIDE STRATEGIC CAPITAL FUND I, L.P.; RSCF BLOCKER TRUE HEALTH, LLC; and RSCF I-A BLOCKER TRUE HEALTH, LLC, *Plaintiffs*, v. CLG INVESTMENTS, LLC; CHRISTOPHER GROTTENTHALER; COVERT INVESTMENT OPERATIONS, LLC; TRUE HEALTH DIAGNOSTIC MANAGEMENT LLC; L. RICHARD COVERT; LCG VENTURES II, LLC; FERNANDO DE LEON; TIMOTHY TATROWICZ ALBA DURATA, LLC; TOM D. WIPPMAN, in his capacity as TRUSTEE OF THE TOM D. WIPPMAN REVOCABLE TRUST; MARK THOMAS SMITH; ALEXANDRA NETTESHEIM; KYLE NETTESHEIM; ROBERT J. OSTERHOFF; RJ INVESTMENTS; MATT MILBURN; MICHAEL A. CLEMENTS; MICHAEL | § § § § § § § § § § § § § § § § § § § § § § § § § § | Cause No. 25-BC01B-0006 |

2964

OSTERHOFF; MELINDA L. §
MILBURN; KAREN A. MILLER; §
JACK NOVAK; EDWARD MCCAN; §
DANIEL GROTTENTHALER; §
ANITA GROTTENTHALER; DANA §
M. HOVIND; CHRISTIAN §
RICHARDS; CHRISTOPHER W. §
KLING; in his capacity as TRUSTEE §
OF CHRISTOPHER W. & MARISSA §
M. KLING REV TRUST U/A/D §
5/11/2012; KEVIN M. NELLIS; §
CAROL A. NELLIS; BRUCE §
ZIVIAN; RYAN NELLIS; and §
ANCELMO E. LOPES, *Defendants* §

---

## MEMORANDUM OPINION

---

[¶ 1] Defendants Tom Wippman, Mark Thomas Smith, Alexandra Nettesheim, Kyle Nettesheim, Robert Osterhoff, RJ Investments, Matt Milburn, Michael Clements, Michael Osterhoff, Karen Miller, Edward McCann, Daniel Grottenthaler, Anita Grottenthaler, Christian Richards, Christopher Kling, Kevin Nellis, Carol Nellis, Bruce Zivian, Ryan Nellis, and Ancelmo E. Lopes[1] filed a special appearance.

---

[1] Referred to herein as "OSDs," meaning out-of-state defendants.

2965

[¶ 2] Having considered the special appearance, response, pleadings, materials on file, and counsels' arguments, the court concluded that it lacked personal jurisdiction over those defendants, granted their special appearance, and dismissed without prejudice the claims against them on July 17, 2025.

[¶ 3] The court concluded that the special appearance should be granted because (i) plaintiffs failed to comply with the pleading requirements stated in *Kelly* and (ii) there are no allegations or evidence that any Out-of-State Defendant purposefully availed itself of Texas by contacting the forum and *those contacts* gave rise to this suit. In other words, it is not enough that defendants invested in a company that may have been headquartered in Texas and that plaintiffs' claims are premised on allegations that the company violated healthcare laws in Texas (and elsewhere) where no alleged fraudulent misrepresentation occurred in, was purposefully directed at, or was communicated to individuals in Texas.

[¶ 4] Further, this action arises from *plaintiffs'* investment in the company (and alleged misrepresentations in the investment agreement), not *defendants'* investment. Plaintiffs' investment agreement was with a Delaware entity, was governed by Delaware law, and did not require any party to perform any act in Texas. It is not alleged to have been negotiated in Texas

2966

or particularly contemplate Texas as the nexus of activities. That representations of the company's compliance with healthcare laws may have allegedly been untrue in Texas (and elsewhere) is a fortuitous contact with the state because the company operated beyond Texas. Accordingly, these defendants' contacts with Texas are insufficient to support this court's personal jurisdiction over them in this action.

## I. BACKGROUND

### A. Plaintiffs' Allegations

[¶ 5] Plaintiffs Riverside Strategic Capital Fund I, L.P.; RSCF Blocker True Health, LLC; and RSCF I-A Blocker True Health, LLC (Riverside) filed this lawsuit against over thirty defendants in the 298th Judicial District Court of Dallas County, Texas.[2] A subset of defendants removed to this court.[3]

[¶ 6] Riverside alleges that it was defrauded in connection with an initial $50 million investment in True Health Group LLC (THG) in 2017.[4] As part of its investment, Riverside entered into a Securities Purchase Agreement (SPA) with defendants that contained representations concerning THG's

---

[2] *See generally* Plaintiffs' Original Petition (Pet.).

[3] *See generally* Defendants LCG Ventures, LLC, LCG Ventures II, LLC, and Leon Capital Partners, LLC's Notice of Removal.

[4] Pet. ¶ 1.

compliance with "applicable Healthcare Laws."[5]  Riverside alleges it later learned that those representations were false, resulting in THG's bankruptcy and the loss of more than $84 million due to defendants' fraud.[6]

## B. Jurisdictional Facts

[¶ 7] The court considers allegations contained in Riverside's petition and related evidence submitted in response to the OSDs' special appearance. *See Kelly v. General Interior Const., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). The court does not consider allegations made outside the petition and only considers additional evidence to the extent it supports or undermines the petition's allegations. *Id.*

[¶ 8] Below are the allegations and evidence material to this opinion. The court considered every allegation contained within Riverside's pleadings, as well as all the evidence submitted by the parties on these issues framed by the pleadings.

---

[5] Pet. ¶ 1.

[6] Pet. ¶s 3–6.

### 1. Plaintiffs' Live Pleading

[¶ 9]  Riverside's petition is devoid of specific jurisdictional allegations as to any OSD, alleging only that "[t]his Court has personal jurisdiction over [the defendants] . . . pursuant to [the Texas Long-Arm Statute]" and that defendants "engaged in business in Texas."[7]

[¶ 10] Riverside later relied on allegations that True Health Diagnostics, LLC (THD), THG's predecessor, and THG itself had business operations in Texas with Texas hospitals, and that defendants knew of THG's business in Texas when they chose to invest in the company.[8]

[¶ 11] Riverside also relied on allegations that defendants designated CLG Investments, LLC as their agent and attorney-in-fact regarding to the SPA.[9] Riverside alleged that CLG is a Delaware limited liability company with its principal place of business in Frisco, Texas and Christopher Grottenthaler its managing member.[10]  Grottenthaler in turn was THG's founder and CEO

---

[7] Pet. ¶s 14–47, 49.

[8] *See, e.g.*, Pet. ¶ 57.

[9] Pet. ¶ 64.

[10] Pet. ¶s 14, 64.

and pled guilty in 2024 to criminal charges for conspiracy to violate certain healthcare laws.[11]

[¶ 12] Finally, Riverside admitted that each OSD was the citizen of a state other than Texas.[12]

### 2.  Jurisdictional Evidence[13]

[¶ 13] As part of their special appearance, each OSD offered a declaration that they were not a Texas citizen, did not reside in Texas when the SPA was signed, and made his or her investment[14] from their home states

---

[11] Pet. ¶ 3.

[12] Pet. ¶s 25 (Tom Wippman), 26 (Mark Thomas Smith), 27 (Alexandra Nettesheim), 28 (Kyle Nettesheim), 29 (Robert Osterhoff), 30 (RJ Investments), 31 (Matt Milburn), 32 (Michael Clements), 33 (Michael Osterhoff), 35 (Karen Miller), 37 (Edward McCann), 38 (Daniel Grottenthaler), 39 (Anita Grottenthaler), 41 (Christian Richards), 42 (Christopher Kling), 43 (Kevin Nellis), 44 (Carol Nellis), 45 (Bruce Zivian), 46 (Ryan Nellis), and 47 (Ancelmo E. Lopes).

[13] The court draws the following from Defendants' Special Appearance (Special Appearance); Riverside's Response to Special Appearances (Riverside's Resp.); Defendants' Reply in Support of Special Appearance (Defs' Reply); Riverside's Supplement to Response to Special Appearances (Riverside's Suppl. Resp.); and Defendants' Response to Plaintiffs' Supplement on Defendants' Special Appearance (Defs' Suppl. Resp.).

[14] The defendants were likely referring to their investment in *THG*, not THD, as stated in the declarations. *See* Special Appearance at Ex. A.  The SPA and various LLC agreements at issue all relate to the parties' investment in THG.  *See, e.g.*, Riverside's Resp. at Ex. A-1 (THG LLC Agreement), A-13 Jan. 26, 2017, Amended THG LLC Agreement; Defs' Suppl. Resp. at Ex. 1 (SPA).

2970

(not Texas).[15]  Additionally, every OSD besides Carol Nellis, Christian Richards, and Michael Osterhoff affirmed that they did not conduct business in Texas during 2017.[16]

[¶ 14] Riverside responded by providing THG's company agreements and materials from a previous litigation filed by THG's bankruptcy trustee, *Willow Tree Consulting Grp., LLC v. Grottenthaler*, No. DC-21-01060 (Dallas County Dist. Ct. Jan. 25, 2021) (Trustee Litigation).

[¶ 15] Following jurisdictional discovery, Riverside provided deposition transcripts for each OSD.[17]  Riverside summarized this testimony as follows: (i) all but one defendant admitted that they signed a 2017 LLC Agreement regarding THG's recapitalization; (ii) all but three admitted they knew THG had business in Texas; and (iii) Michael Osterhoff, Carol Nellis, Tom Wippman, and Christian Richards had additional contacts with Texas in connection with THG (discussed in more detail below).[18]

---

[15] *See generally* Exhibit A to Special Appearance.

[16] *See generally* Exhibit A to Special Appearance.

[17] *See generally* Appendix to Riverside's Suppl. Resp.

[18] Riverside's Suppl. Resp. at 16–17.

[¶ 16] Finally, defendants provided the SPA and a declaration from Christian Richards stating they moved to Virginia in January 2016 and worked at the THG headquarters in Virginia after that time.[19]

## C. Parties' Arguments

[¶ 17] Riverside's arguments essentially are that each OSD (i) knowingly invested in an entity (THG) with substantial Texas-based business activities; (ii) designated CLG Investments, LLC as their agent in connection with the SPA; (iii) consented to jurisdiction in Texas by signing the THG LLC Agreement in connection with the 2017 recapitalization; (iv) waived their objection to personal jurisdiction by appearing generally in the Trustee Litigation in Texas; and (v) four OSDs had additional Texas contacts related to their work with THG.

[¶ 18] The court concludes that (i), (ii), and (v) are rooted in an analysis of the minimum contacts of the OSDs with Texas and their connection to this lawsuit (*i.e.*, specific jurisdiction) whereas (iii) and (iv) are not based on OSDs' pre-suit contacts. The court's analysis below follows this division.

---

[19] Def's Suppl. Resp. at Exs. 1 & 3.

[¶ 19] OSDs argued that the petition failed to allege sufficient facts establishing jurisdiction over any OSD, and that under *Kelly* and *Steward Health* the court cannot consider factual allegations outside the pleadings.[20] They disputed that any of Riverside's arguments made jurisdiction proper in this case.[21] Accordingly, OSDs needed to prove only that they were non-residents, which they did.[22]

[¶ 20] The court agrees with OSDs.

## II.   APPLICABLE LAW

### A. Special Appearances

[¶ 21] "[P]ersonal jurisdiction is a 'waivable right' and [a defendant] may give 'express or implied consent to the personal jurisdiction of the court.'" *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 704 (Tex. App.—Dallas 2010, no pet.). "To the extent a party has consented to jurisdiction in a particular forum, the trial court's exercise of personal jurisdiction over it does not violate due process even in the absence of contacts with Texas." *Id.*

---

[20] Defs' Resp. at 3–4.

[21] *See generally* Defs' Resp. & Defs' Suppl. Resp.

[22] Special Appearance at 4.

2973

[¶ 22] Rule of Civil Procedure 120a governs special appearances. TEX. R. CIV. P. 120a(1). A party availing itself of Rule 120a must strictly comply with its terms because failure to do so results in waiver. *PetroSaudi Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 136 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

[¶ 23] A party waives its special appearance when it (i) invokes the court's judgment on any question other than the court's jurisdiction; (ii) recognizes by its acts that an action is properly pending against it; or (iii) seeks affirmative action from the court. *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004) (per curiam) (citing *Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998)). But a party does not waive its jurisdictional challenge by seeking affirmative relief consistent with the special appearance. *Nationwide Distrib. Servs., Inc. v. Jones*, 496 S.W.3d 221, 225 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

## B. *In Personam* Jurisdiction

[¶ 24] A nonresident defendant is subject to personal jurisdiction in Texas if (i) the Texas long-arm statute authorizes the exercise of jurisdiction and (ii) the exercise of jurisdiction does not violate federal or state constitutional due process guarantees. *Kelly*, 301 S.W.3d at 657.

2974

[¶ 25]  The long-arm statute permits courts to exercise jurisdiction over a defendant who "does business in this state," which the Legislature defines to include a nonresident defendant who "commits a tort in whole or in part in this state."  *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023) (quoting TEX. CIV. PRAC. & REM. CODE § 17.042(2)).

[¶ 26]  The statute's broad "doing business" language (that is, committing a tort in whole or in part in Texas) allows the trial court's jurisdiction to "reach as far as the federal constitutional requirements of due process will allow."  *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

[¶ 27]  Therefore, courts need "only analyze whether [the defendant]'s acts would bring [the defendant] within Texas' jurisdiction consistent with constitutional due process requirements."  *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

[¶ 28]  A state's exercise of jurisdiction comports with federal due process if (i) the nonresident defendant has "minimum contacts" with the state and (ii) the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  *M&F Worldwide Corp. v. Pepsi-Cola*

*Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

### 1.    Minimum Contacts

[¶ 29]  A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco*, 278 S.W.3d at 338.

[¶ 30]  Courts consider three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Id.* at 339 (quoting *Moki Mac*, 221 S.W.3d at 575); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005).

[¶ 31] The minimum-contacts analysis focuses on the "quality and nature of the defendant's contacts," not quantity.  *Retamco*, 278 S.W.3d at 339.

[¶ 32] "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Id.* at 338 (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).

### a. General Personal Jurisdiction

[¶ 33] A court has general jurisdiction over a nonresident defendant whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (alteration in original) (quoting *Daimler v. Bauman*, 571 U.S. 117, 127 (2014)). This test requires "substantial activities within the forum" and presents "a more demanding minimum contacts analysis than for specific jurisdiction." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 797 (Tex. 2002). When a court has general jurisdiction over a nonresident, it may exercise jurisdiction "even if the cause of action did not arise from activities performed in the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

### b. Specific Personal Jurisdiction

[¶ 34] Specific jurisdiction requires that "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco*, 278 S.W.3d at 338 (buying Texas real estate) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579; *Guardian Royal*, 815 S.W.2d at 228 (specific jurisdiction focuses on "the relationship among the defendant, the forum and the litigation").

[¶ 35] For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. The "operative facts" of a litigation are those that "will be the focus of the trial" and "will consume most if not all of the litigation's attention." *Id.* at 585.

[¶ 36] Specific jurisdiction requires courts to analyze jurisdictional contacts on a claim-by-claim basis. *Moncrief Oil Int'l Inc. v. OAO Gazprom*,

2978

414 S.W.3d 142, 150 (Tex. 2013); *see also Seiferth v. Helicopteros Atuneros*, Inc., 472 F.3d 266, 274–75 (5th Cir. 2006) ("If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts."). But a court need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contact. *Moncrief*, 414 S.W.3d at 150–51.

### 2.    Fair Play and Substantial Justice

[¶ 37] If the minimum contacts requirements are met, it is "rare" for exercising personal jurisdiction to not comply with fair play and substantial justice. *Retamco*, 278 S.W.3d at 341. Nonetheless, courts still consider factors to ensure that exercising jurisdiction does not offend traditional notions of fair play and substantial justice:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* (citing *Burger King*, 471 U.S. at 477–78).

2979

### 3. The Parties' Burdens

[¶ 38] The plaintiff "bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658. If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute, to negate jurisdiction the defendant need only prove that it does not live in Texas. *Id.* at 658–59. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* at 658.

[¶ 39] "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.* Defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659.

[¶ 40] Factually, a defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* The plaintiff must then respond with its own evidence that affirms its allegations or else risk dismissal. *Id.* However, the court considers "additional evidence," including, "stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes,

2980

and any oral testimony," to the extent it supports or undermines the pleadings' allegations. *Id.* at 658 n.4 (citing Tᴇx. R. Cɪᴠ. P. 120a(3)). If the plaintiff's evidence is not within the scope of the pleadings' factual allegations, the plaintiff should amend the pleadings for consistency. *Id.* at 659 n.6; *see also Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 129 (Tex. App.— Dallas 2021, no pet.) (en banc).

[¶ 41] The defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction either (i) because the defendant's contacts with Texas fall short of purposeful availment (including that the claims do not arise from the contacts) or (ii) that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.* at 659.

### III. Dɪsᴄᴜssɪᴏɴ

#### A. *Kelly* and *Steward Health Care*

[¶ 42] As a preliminary matter, the court concludes that plaintiffs' failure to plead specific, non-conclusory jurisdictional allegations for any OSD is an independent reason to grant the special appearance.

[¶ 43] As discussed at ¶s 9–12, Riverside's live pleading's only jurisdictional allegations are that "[t]his Court has personal jurisdiction over

2981

[the defendants] . . . pursuant to [the Texas Long-Arm Statute]" and that defendants "engaged in business in Texas."[23]

[¶ 44] These allegations are conclusory and "insufficient to meet [Riverside's] burden of establishing jurisdiction" over any OSD. *PermiaCare v. L.R.H.*, 600 S.W.3d 431, 444 (Tex. App.—El Paso 2020, no pet.) (citing *State v. Lueck*, 290 S.W.3d 876, 884–85 (Tex. 2009)). Instead, Riverside had to allege specific facts that, if true, would affirmatively demonstrate the court's jurisdiction over defendants. *Id.*

[¶ 45] Riverside's arguments and evidence opposing the special appearance do not save it. The court considers only allegations in plaintiffs' petition—not allegations made in its response—and considers additional evidence only to the extent it supports or undermines those allegations. *Kelly*, 301 S.W.3d at 658–59; *see also id.* 658 n.4. As the Dallas Court of Appeals explained in *Steward Health*:

> Thus, according to *Kelly*, the allegations on which the plaintiff bases the exercise of jurisdiction over the defendant must be in the petition. The plaintiff's response to the special appearance may contain evidence supporting the petition's jurisdictional allegations, but that evidence must be consistent with the allegations in the petition.

---

[23] Pet. ¶s 14–47, 49.

633 S.W.3d at 129.

[¶ 46] "When the pleading is wholly devoid of jurisdictional facts, the plaintiff should amend the pleading to include the necessary factual allegations, . . . thereby allowing jurisdiction to be decided based on evidence rather than allegations, as it should be." *Kelly*, 301 S.W.3d at 659.

[¶ 47] Because Riverside never amended its pleading, the evidence submitted in its oppositions does not relate to any non-conclusory allegations in its pleading. Accordingly, the court need not consider the allegations or evidence submitted with its briefing. *Kelly*, 301 S.W.3d at 659 n.6 ("If the plaintiff's evidence does not fall within the scope of the factual allegations in the pleading, then the plaintiff should amend the pleading for consistency"); *Steward Health*, 633 S.W.3d at 129 (same).

[¶ 48] Furthermore, *Lobell*, which Riverside extensively relied on in its briefing, says the same. *See Lobell v. Cap. Transp., LLC*, 2015 WL 9436255, at *4 (Tex. App.—Austin Dec. 15, 2015, no pet.) (". . . though this additional evidence m*erely supports or undermines allegations in pleadings*." (emphasis added)).

2983

[¶ 49]  Riverside was alerted to this issue in the OSDs' reply brief.[24] Yet, Riverside ignored defendants' argument.[25]

[¶ 50]  Therefore, because Riverside did not plead facts or present proper evidence sufficient to bring the OSDs within the court's jurisdiction (under the long-arm statute or based on due process), those defendants needed to show only that they were not residents of Texas. *Kelly*, 301 S.W.3d at 658–59. They did so.[26]

[¶ 51]  Alternatively, even if the court were to consider the additional allegations and evidence, they fail to demonstrate that any OSD had sufficient minimum contacts with Texas to establish the court's jurisdiction.

## B.  Riverside's Contacts-Based Arguments

[¶ 52]  Riverside did not argue or allege general jurisdiction applies here.[27]  Accordingly, the court reasonably construes Riverside to argue that the OSDs are subject to specific jurisdiction because each (i) invested in a

---

[24] Defs' Reply at 3–4 (citing both *Kelly* and *Steward Health*).

[25] Riverside's Suppl. Resp. at 6 n.1 (acknowledging that both cases say the court can consider evidence attached to the opposition but ignoring *Steward*'s holding that the evidence must comport with the allegations in the petition).

[26] *See, e.g.*, Special Appearance at Ex. A.

[27] *See generally* Riverside's Resp. & Riverside's Suppl. Resp.

2984

Texas-headquartered organization with substantial business operations in the state and (ii) designated CLG Investment, LLC as their agent in connection with the SPA.[28]

[¶ 53] Plaintiffs further argue that four OSDs have additional Texas contacts to support the court's jurisdiction.[29]

[¶ 54] The court rejects these arguments:

## 1. All OSDs

### a. Argument One: OSDs knowingly invested in a Texas-based enterprise

[¶ 55] The court begins by clarifying its understanding of Riverside's argument. Riverside's initial response argued that the OSDs had minimum contacts with Texas because each (i) "knowingly invested in and sought to profit from True Health—a company headquartered in Texas and with substantial operations in the state" and (ii) signed a separate LLC agreement that required disputes be resolved in Texas.[30] Riverside's supplemental

---

[28] Riverside's Resp. 9–14, 20–23; Riverside's Suppl. Resp. at 4–5, 18.

[29] Riverside's Resp. 23–26; Riverside's Suppl. Resp. at 14–16.

[30] Riverside Resp. at 20–21.

response argued that these facts mean defendants "consented" to jurisdiction in Texas. [31]

[¶ 56] The court reasonably construes the former to be a contacts-based, specific jurisdictional argument and the latter to be a true consent-based, venue provision argument. The court addresses the consent/LLC agreement argument later in this opinion.

[¶ 57] Riverside cites the Austin Court of Appeals decision of *Lobell* and the landmark supreme court *Retamco* case for the proposition that the OSDs knew they were creating "continuing relationships with and obligations to Texas citizens" by choosing to invest in a company headquartered in Texas[32] ~~and~~ with Texas-based operations, and therefore they have sufficient minimum contacts with Texas.[33] *Lobell*, 2015 WL 9436255, at \*6; *see also Retamco*, 278 S.W.3d at 339.

[¶ 58] In *Retamco*, the plaintiff alleged that the non-resident defendant violated the Texas Uniform Fraudulent Transfer Act (TUFTA) by acting as the

---

[31] Riverside Suppl. Resp. at 18–21.

[32] There appears to be a dispute whether THG or THD were headquartered in Texas in 2017 when the SPA was signed. *Compare* Riverside Suppl. Resp. at 4–5, 11–16 *with* Defs' Suppl. Resp. at 3. The distinction is not material to the court's decision.

[33] *See* Riverside Resp. at 22–23, 25–26; Riverside Suppl. Resp. at 18–19.

2986

transferee of Texas oil and gas interests. 278 S.W.3d at 335. Because oil and gas interests were real property interests, the supreme court held that the defendants' Texas contacts were purposeful, not random, fortuitous, or attenuated. *Id.* at 339. Accordingly, the fraudulent transfer *claims related directly to the alleged contacts*—defendants' receipt of Texas oil and gas interests.

[¶ 59] Likewise, the *Lobell* plaintiff "alleg[ed] *breach of partnership agreement* and various tort claims" when a partnership fell apart. 2015 WL 9436255, at *2 (emphasis added). The plaintiff further alleged and provided evidence that "the heart of the operations" of said partnership would be in Texas. *Id.* at *5. Accordingly, the court held that "the record reflects that Lobell 'most certainly knew that he was affiliating himself with' a business based in Texas when he created continuing relationships with and obligations to Texas citizens Denton and Baker and that the alleged partnership had a substantial connection with Texas." *Id.* at *6 (citing *Burger King*, 471 U.S. at 473). Again, the claims—breach of partnership agreement—related directly to the contacts that the court found created a substantial connection with Texas (*i.e.*, the Texas partnership).

2987

[¶ 60] This case is different because it does not arise out of *OSDs'* investment in THG. Instead, Riverside's claims arise out of *their* investment in THG and alleged fraud in the SPA. Thus, there is no substantial connection between these contacts (defendants' investment in THG) and the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 585; *see also id.* at 579 ("[F]or specific-jurisdiction purposes, purposeful availment has *no jurisdictional relevance unless* the defendant's liability arises from or relates to the forum contacts." (emphasis added)).

[¶ 61] Further, there is no evidence that (i) any OSD had direct contact with any plaintiff in Texas or otherwise, (ii) any OSD was in Texas when they signed the SPA, or (iii) that the SPA required any party to perform in Texas.

[¶ 62] Finally, regardless of whether THG was headquartered in Texas, that fact does not support the court's jurisdiction over its investors because it is not an operative fact of Riverside's claims and THG's contacts cannot be imputed against its individual owners. *See Nikolai v. Strate*, 922 S.W.2d 229, 241 (Tex. App.—Fort Worth 1996, writ denied) ("Texas law is clear that a business's contacts may not be imputed to its personnel to establish personal jurisdiction over them."); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437–38 (Tex. 1982) ("it is the contacts of the defendant himself that are

determinative"). In other words, THG could have been headquartered anywhere and the result would be the same (*i.e.*, it is fortuitous).

[¶ 63] Accordingly, because whether the OSDs invested in a Texas-headquartered entity is not an operative fact of this litigation, Riverside's first contacts-based argument fails to demonstrate that this court has jurisdiction over those defendants.

### b. Argument Two: OSDs authorized CLG Investments, LLC to act as its agent during the SPA process

[¶ 64] Riverside argues that CLG Investments, LLC was the agent and attorney-in-fact for the OSDs in connection with the SPA and that it was managed by Christopher Grottenthaler.[34] Accordingly, it argues CLG's "jurisdictional contacts with respect to the SPA are therefore imputed to the Specially Appearing Defendants."[35] The petition further states that CLG is a Delaware LLC with its principal place of business in Frisco, Texas.[36]

---

[34] Riverside Resp. at 14, 21; *see also* Pet. ¶s 64, 86.

[35] Riverside Resp. at 22. Riverside states in its briefing that "[e]ach of the Specially Appearing Defendants made affirmative representations about True Health's Texas-based business in order to induce plaintiffs to invest in the company, which allowed defendants to obtain millions of dollars in distributions." Riverside Resp. at 21. There are no allegations or evidence anywhere in the record to support this statement that the court is aware of. The court assumes Riverside means by designating CLG as its agent, alleged misrepresentations in the SPA made by CLG/Grottenthaler can be imputed to the OSDs.

[36] Pet. ¶s 14.

[¶ 65] The court rejects those arguments for two reasons.

[¶ 66] First, regardless of whether CLG was OSDs' agent, where it resides (its principal place of business) is irrelevant in a specific-jurisdictional inquiry concerning OSDs. *See Siskind*, 642 S.W.2d at 437–38.

[¶ 67] Second, the court agrees with OSDs that Riverside has made no allegation or presented evidence that CLG took any action in Texas on behalf of defendants connected to OSDs' alleged misrepresentations.[37] Accordingly, there are no contacts upon which the court can find specific jurisdiction.

[¶ 68] In requesting time to take jurisdictional discovery, Riverside stated that relevant discovery would include "the actions taken by CLG Investments in Texas as agent for defendants under the SPA."[38] However, Riverside presented no evidence in its supplemental response showing any action CLG took in Texas or any misrepresentations made there.[39] Neither did Riverside provide any evidence related to Christopher Grottenthaler' actions in Texas CLG's manager.[40]

---

[37] See Defs' Reply at 7.

[38] Riverside Resp. at 31.

[39] *See generally* Riverside's Supp. Resp.

[40] *See generally* Riverside's Supp. Resp.

[¶ 69] Accordingly, Riverside's second contacts-based argument fails to demonstrate that this court has jurisdiction over the OSDs.

## 2. Nellis, Osterhoff, Richards, and Wippman

[¶ 70] Plaintiffs argue that "four of the [OSDs] admitted to performing work for True Health, traveling to Texas in order to conduct True Health business, and conducting True Health business directed towards Texas."[41]

### *Michael Osterhoff*

[¶ 71] Michael Osterhoff was general counsel for THG and admitted to (i) travelling to Texas for THG, (ii) giving the company legal advice regarding healthcare regulations, and (iii) reviewing a specific contract with a Texas rural hospital that relates to claims in the petition.[42]

[¶ 72] OSDs responded with evidence that Osterhoff's office in 2017 was at THG's headquarters in Virginia and he did not provide any legal

---

[41] Riverside's Suppl. Resp. at 7–8; *see also id.* at 14–16. Riverside also summarily stated that Daniel and Anita Grottenthaler "[v]isited True Health Texas [c]orporate [h]eadquarters." Riverside's Suppl. Resp. at 17. However, Riverside did not attempt to tie those visits to the operative facts of this litigation, and the court concludes they do not demonstrate personal jurisdiction.

[42] Riverside Resp. at 11; Riverside Suppl. Resp. at 14–15.

services in connection with the SPA.[43]   Riverside provided no controverting evidence.

### Carol Nellis

[¶ 73]  Carol Nellis was True Health's Vice President of National Sales and Marketing and then a Regional Vice President of Sales and (i) admitted to traveling weekly to Texas for over a year for THG and (ii) communicating with physicians in Texas.[44]

[¶ 74]  OSDs responded with evidence that Nellis traveled to Texas on a weekly basis for THG only in 2014 and 2015 and that her travel stopped once the THG headquarters moved to Virginia.[45]   Further, she was not involved with the SPA.[46]   Riverside provided no controverting evidence.

### Tom D. Wippman

[¶ 75]  Tom Wippman was a THG director and a member of the board's compliance subcommittee, and he admitted to attending THG board meetings in Texas.[47]

---

[43] Defs' Suppl. Resp. at 8.

[44] Riverside Resp. at 12–13; Riverside Suppl. Resp. at 15.

[45] Defs' Suppl. Resp. at 7.

[46] Defs' Suppl. Resp. at 7–8.

[47] Riverside Resp. at 13; Riverside Suppl. Resp. at 15.

[¶ 76] However, Wippman provided evidence that he served as a director in his personal capacity, but he is present in this lawsuit in his capacity as trustee of the Tom D. Wippman Trust.[48]  Accordingly, OSDs argue that there is no evidence Wippman had any connection to Texas as trustee of the trust.[49]  The court agrees.

### Christian Richards

[¶ 77] Christian Richards was THG's CFO and lived in Texas in 2015 while working for THG.[50]

[¶ 78] OSDs presented a declaration from Richards testifying that he moved to Virginia in January 2016 when THG moved its corporate headquarters and argued that he had no contacts relevant to the alleged fraudulent statements in the SPA.[51]

* * * * *

[¶ 79] The court concludes that none of Osterhoff, Nellis, Wippman, or Christian was a Texas resident when the alleged fraud occurred with the SPA

---

[48] Riverside's Suppl. Resp. at Ex. D at 4:23–5:5.

[49] Defs' Suppl. Resp. at 9.

[50] Riverside Resp. at 11–12; Riverside Suppl. Resp. at 16.

[51] Defs' Suppl. Resp. at Ex. 3; Defs' Suppl. Resp. at 7.

signing, came to Texas in connection with the SPA, or made personal misrepresentations concerning the SPA (directed at Texas or otherwise).

[¶ 80] The court further concludes that none of Osterhoff, Nellis, Wippman, or Christian's contacts with Texas described above have a substantial connection to Riverside's claims concerning fraud in the SPA. Even Osterhoff is not alleged or shown to have made any personal representations to Riverside, and Riverside has not shown that he had an independent duty to report wrongdoings to Riverside regarding the SPA.

[¶ 81] Accordingly, Riverside has not demonstrated personal jurisdiction over Osterhoff, Nellis, Wippman, or Christian.

\* \* \* \* \*

[¶ 82] Therefore, the court concludes that none of the OSDs have minimum contacts with Texas such that the exercise of jurisdiction comports with due process. *Moki Mac*, 221 S.W.3d at 575.

## C. Riverside's Non-Contacts-Based Arguments

[¶ 83] Riverside presents two non-contacts-based arguments: (i) the OSDs consented to jurisdiction in Texas in connection with the 2017 THG

2994

LLC Agreement and (ii) most of the OSDs waived personal jurisdiction in Texas by appearing generally in the Trustee Lawsuit.[52]

[¶ 84]  The court rejects these arguments:

### 1.    Forum-Selection Clause

[¶ 85]  The same day that the SPA was executed the OSDs executed the 2017 THG LLC Agreement, which contained the following "Consent to Jurisdiction" provision:[53]

> Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder . . . shall be brought and determined exclusively in the Federal or State Courts located in Dallas, Texas[.]  . . .  Each of the parties hereto hereby irrevocably submits *with regard to any such action or proceeding* . . . generally and unconditionally, to the personal jurisdiction of the aforesaid courts[.]  . . .  Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, *in any action or proceeding with respect to this Agreement and the rights and obligations hereunder* . . . any claim that it or its property is exempt or immune from jurisdiction of any such court.[54]

---

[52] Riverside's Resp. at 10, 15–18, 21, 28–30; Riverside's Suppl. Resp. at 19–23.

[53] Riverside Resp. at 10, 21; Riverside Suppl. Resp. at 19–20.

[54] Riverside Resp. at Ex. A-13, § 10.5(a) (App. 411) (emphasis added).

2995

[¶ 86] Riverside argues this clause amounted to a "consent" of jurisdiction in Texas generally as well as for claims arising out of the 2017 recapitalization of THG.[55] The court rejects that argument for several reasons.

[¶ 87] For starters, Riverside's reproduction of the provision excluded the emphasized portions above.[56] Including these phrases shows that this provision reaches only claims *arising under* the 2017 THG LLC Agreement.

[¶ 88] This case does not arise out of the 2017 THG LLC Agreement. All the alleged misrepresentations that Riverside sues on were made in the SPA.[57] In fact, Riverside's petition does not mention the THG LLC Agreement.[58]

[¶ 89] Furthermore, Riverside's argument that the THG LLC Agreement's mandatory venue provision applies to any claim relating to the "recapitalization" of THG is contradicted by the SPA's separate venue provision. The SPA states:

> Each party to this agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this agreement . . . may be brought in the courts of the State of

---

[55] Riverside Suppl. Resp. at 19–20.

[56] *Compare* Riverside Suppl. Resp. at 20 *with* Riverside Resp. at App. 411.

[57] *See generally* Pet.

[58] *See generally* Pet.

2996

Delaware or of the United States of America for the District of Delaware and hereby expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof.[59]

[¶ 90] If the 2017 THG LLC Agreement's mandatory venue provision meant that all claims regarding the 2017 "recapitalization" must be brought in Texas, the SPA's permissive venue provision would be rendered meaningless. *See U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023) (a court must harmonize and give effect to all the provisions of a contract by analyzing the provisions with reference to the whole agreement); *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024) (when possible, courts construe a text in a way that does not render any of it meaningless).

[¶ 91] Accordingly, the court concludes that Riverside's claims arise out of the SPA, not the 2017 THG LLC Agreement, and therefore the OSDs did not consent to personal jurisdiction for the purposes of this action via the LLC Agreement.

---

[59] Def. Suppl. Resp. at Ex. 1 (SPA), § 8.9.

## 2.	Waiver

[¶ 92] Finally, citing to the court's decision in *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 5, 2025 WL 446345, at *1 (1st Div.), Riverside argues that most of the OSDs waived any challenge to personal jurisdiction by generally appearing in the Trustee Litigation.[60]  However, *Primexx* is distinguishable and therefore does not control here.

[¶ 93] *Primexx* involved the same plaintiffs, the same defendants (except one additional defendant), and the same claims arising out of the same transaction as an earlier action filed in Texas.  *Id.*, ¶ 75.  The court accordingly found that the case before it was "essentially a continuation" of the earlier proceeding and therefore defendants' general appearance in that earlier proceeding waived their ability to contest personal jurisdiction in the second proceeding.  *Id.*, ¶s 74–77.

[¶ 94] However, the court's holding did not overturn the general premise "that a foreign defendant [does not] waive[] its right [to] object to personal jurisdiction, or consent[] to jurisdiction, in Texas by having defended

---

[60] Riverside Resp. at 28–30; Riverside Suppl. Resp. at 22–23.

other lawsuits in Texas." *Megadrill Services Ltd. v. Brighouse*, 556 S.W.3d 490, 498 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

[¶ 95] The case at bar is not "essentially a continuation" of the Trustee Litigation. The plaintiffs are different (Riverside versus the bankruptcy trustee), defendants are not all the same, and while many of the claims are based on the same or similar allegations, there is less overlap than *Primexx*. For instance, while both Riverside and the trustee allege THG violated healthcare laws through the use of medical services organizations (MSOs) and rural hospital billing schemes, the trustee presented far more additional claims related to the payment of illegal renumerations, billing schemes, etc.[61] And the claims are different; while Riverside's claims are rooted primarily in fraud, the trustee included claims related to breach of fiduciary duties, negligence, and fraudulent transfers.[62]

[¶ 96] Finally, the court is persuaded by OSDs' argument that the Trustee Litigation arose at least in part out of the THG LLC Agreement. Unlike this action, that lawsuit involved claims for breach of fiduciary duties

---

[61] *Compare* Pet. ¶s 57–61 *with* Defs' Suppl. Resp. at Ex. 1, ¶s 91, 93–118.

[62] *Compare* Pet. ¶s 83–98 *with* Defs' Suppl. Resp. at Ex. 1, ¶s 215–377.

2999

that the LLC Agreement created. So, the THG LLC Agreement's mandatory venue provision arguably foreclosed those defendants' ability to object to jurisdiction in that case. That consideration weighs against finding waiver here, where the LLC Agreement does not apply.

## IV.  CONCLUSION

[¶ 97]  For these reasons, the court previously granted the OSDs' special appearances on July 17, 2025.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  August 19, 2025

3000

# EXHIBIT 5

2025 Tex. Bus. 35



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| RIVERSIDE STRATEGIC CAPITAL FUND I, L.P.; RSCF BLOCKER TRUE HEALTH, LLC; and RSCF I-A BLOCKER TRUE HEALTH, LLC, *Plaintiffs* | § § § § § | |
| v. | § § | Cause No. 25-BC01B-0006 |
| CLG INVESTMENTS, LLC; CHRISTOPHER GROTTENTHALER; COVERT INVESTMENT OPERATIONS, LLC; TRUE HEALTH DIAGNOSTIC MANAGEMENT LLC; L. RICHARD COVERT; LCG VENTURES II, LLC; FERNANDO DE LEON; TIMOTHY TATROWICZ ALBA DURATA, LLC; TOM D. WIPPMAN, in his capacity as trustee of the Tom D. Wippman Revocable Trust; MARK THOMAS SMITH; ALEXANDRA NETTESHEIM; KYLE NETTESHEIM; ROBERT J. OSTERHOFF; RJ INVESTMENTS; MATT MILBURN; MICHAEL A. | § § § § § § § § § § § § § § § § § § § § § | |

| | |
|---|---|
| CLEMENTS; MICHAEL | § |
| OSTERHOFF; MELINDA L. | § |
| MILBURN; KAREN A. MILLER; | § |
| JACK NOVAK; EDWARD | § |
| MCCAN; DANIEL | § |
| GROTTENTHALER; ANITA | § |
| GROTTENTHALER; DANA M. | § |
| HOVIND; CHRISTIAN | § |
| RICHARDS; CHRISTOPHER W. | § |
| KLING; in his capacity as trustee | § |
| of Christopher W. & Marissa M. | § |
| Kling Rev Trust u/a/d 5/11/2012; | § |
| KEVIN M. NELLIS; CAROL A. | § |
| NELLIS; BRUCE ZIVIAN; RYAN | § |
| NELLIS; and ANCELMO E. | § |
| LOPES, *Defendants* | § |

═══════════════════════════════════════════

**OPINION**

═══════════════════════════════════════════

### *Syllabus[1]*

*This opinion addresses when statutes of limitations accrue and the application of the discovery rule and fraudulent concealment principles regarding claims of fraudulent statements contained in a securities purchase agreement.*

---

[1] The syllabus was created by court staff and is provided for the reader's convenience. It is not part of the court's opinion, does not constitute the court's official description or statement, and should not be relied upon as legal authority.

OPINION, Page 1

0004

# I. OPINION

[¶ 1]  This fraud case arises out of a securities purchase agreement. Plaintiffs invested into a healthcare company that provided laboratory management and diagnostic services.  They allege that the defendants made false representations regarding the company's compliance with applicable laws.

[¶ 2]  Plaintiffs sued the defendants for (i) fraud, (ii) money had and received, and (iii) conspiracy.

[¶ 3]  Defendants moved for traditional summary judgment arguing that statutes of limitations bar plaintiffs' causes of action.  The outcome rests on when plaintiffs knew, or should have known through the exercise of reasonable diligence, facts giving rise to their causes of action.

[¶ 4]  The summary judgment evidence conclusively establishes that plaintiffs were aware of facts, conditions, or circumstances more than four years before filing suit that would cause a reasonably prudent person to make an inquiry that if pursued would have led them to discover their causes of action.  This inquiry notice is legally equivalent to knowledge of the causes of action.  Thus, plaintiffs' claims are barred because they failed to sue within the limitations period.  Further, they failed to raise a genuine issue of material fact

regarding fraudulent concealment.

## II.   JURISDICTION AND VENUE

[¶ 5]   This court has subject matter jurisdiction because this is an action arising out of a qualified transaction and the amount in controversy exceeds $10 million.  TEX. GOV'T CODE § 25.A.004(d)(1).[2]  The court also has jurisdiction under TEX. GOV'T CODE § 25.A.004(b)(2) because this is an action regarding the internal affairs of an organization and the amount in controversy exceeds $5 million.  TEX. GOV'T CODE § 25.A.004(b)(2).

## III.   THE SUMMARY JUDGMENT RECORD

[¶ 6]   The court considered the pleadings, summary judgment submissions, and related oral arguments.

## IV.   FACTS

### A. The Parties and Related Entities

[¶ 7]   True Health Group LLC provided laboratory management and diagnostic services for the healthcare industry.[3]  Plaintiffs invested in True

---

[2] Effective September 1, 2025, the legislature lowered the qualified transaction monetary threshold from $10 million to $5 million.  *See* Tex. H.B. 40, 89th Leg., R.S. (2025).  However, plaintiffs filed this suit before that change became effective.  So, the $10 million threshold applies to this case.

[3] Plaintiffs' Original Petition (Pet.) ¶ 1.

Health.  Defendants were "significant equityholders" in True Health.[4]

[¶ 8]   Plaintiff Riverside Strategic Capital Fund I L.P. is a Delaware limited partnership investment fund.[5]

[¶ 9]   Plaintiffs RSCF Blocker True Health, LLC and RSCF I-A Blocker True Health, LLC are Delaware limited liability companies that Riverside used to structure its investment in True Health.[6]

## B.  Investigations and Proceedings Against THD

[¶ 10]   In March of 2014, Christopher Grottenthaler founded True Health Diagnostics (THD), True Health's predecessor.[7]

[¶ 11]   In 2015, THD purchased the assets of another laboratory company called Health Diagnostics Laboratory, Inc. (HDL).[8]  Prior to the acquisition, HDL was allegedly driven out of business because of pervasive healthcare fraud.[9]

[¶ 12]   In November of 2015, THD signed a laboratory processing

---

[4] Pet. ¶ 1.  The parties' agreement defines "significant equity holders" to mean "the members of the Company set forth on the signature pages" thereto.  Securities Purchase Agreement (SPA) at Preamble (Defs' 1 App. 0014).

[5] Pet. ¶ 11.

[6] Pet. ¶s 12–13.

[7] Pet. ¶ 57.

[8] Geren Declaration ¶ 4 (Defs' 2 App. 0583).

[9] Geren Declaration ¶ 4 (Defs' 2 App. 0583); Trustee Lawsuit at 21 n.17 (Defs' 2 App. 665).

agreement with Little River Healthcare (LRH).[10]

[¶ 13]  The next year, THD underwent a corporate reorganization and became True Health's subsidiary.[11]

[¶ 14]  Prior to Plaintiffs' (Riverside) investment into True Health, the company had been accused in online articles of continuing the fraudulent activities that had resulted in HDL going out of business.[12]  Riverside was aware of these articles.[13]

[¶ 15]  On April 29, 2016, Cigna issued THD with a notice of claims review and audit.[14]

[¶ 16]  A few days later, United Healthcare halted laboratory claim reimbursements to THD due to compliance concerns.[15]

[¶ 17]  Later that year, Medicare investigators visited True Health's headquarters, requested documents, placed several referring physicians on prepayment review, and commenced a billing audit.[16]

[¶ 18]  On January 26, 2017, Riverside invested $50 million into True

---

[10] Pet. ¶ 57.
[11] Pet. ¶ 62.
[12] *See* Pls' 2 App. 255–59.
[13] Greenberg Depo. at 282:5–284:23 (Defs' 2 App. 0548).
[14] Trustee Lawsuit ¶ 129 (Defs' 2 App. 0679).
[15] Trustee Lawsuit ¶ 129 (Defs' 2 App. 0679).
[16] Trustee Lawsuit ¶ 128 (Defs' 2 App. 0679).

Health in exchange for preferred True Health units and the right to buy more units on a diluted basis by executing the Securities Purchase Agreement (SPA) and Exchange Agreement.[17]  CLG Investment, LLC was appointed as the "Equityholders' Representative" for the deal.  Christopher Grottenthaler was at all relevant times CLG Investments, LLC's managing member.[18]  Further, as part of this deal, Riverside managing director Hal Greenberg became a True Health board member.[19]

[¶ 19]  On March 2, 2017, the U.S. Department of Justice served True Health with a Civil Investigative Demand (CID) concerning possible Anti-Kickback Statute and Stark Law violations and other issues.[20]

[¶ 20]  Three months later, the Centers for Medicare & Medicaid Services (CMS) placed True Health on a 100% suspension of Medicare payments and provided a notice that the suspension was due to "credible allegations of fraud" regarding billing practices and claim submissions.[21]

[¶ 21]  However, a month later, CMS reduced the suspension to 35%.[22]

---

[17] Pet. ¶ 63.
[18] Pet. ¶ 64.
[19] Greenberg Dep. 110:17–23 (Defs' 2 App. 0539); Board Minutes (Defs' 1 App. 0150).
[20] CID (Defs' 1 App. 0363–87).
[21] Pet. ¶ 73; CMS Notice of First Suspension (Defs' 2 App. 0388-91).
[22] Pet. ¶ 74; Zucker Declaration ¶ 18 (Defs' 2 App. 0603).

[¶ 22]   After the first CMS suspension, Riverside invested another $30 million into True Health to keep the company afloat and subsequently took control of the board in May of 2018.[23]

[¶ 23]   On November 19, 2018, a non-Riverside True Health board member met with the U.S. Department of Justice to discuss the investigations into True Health, including the kickback allegations.[24]

[¶ 24]   Between June of 2017 and May of 2019, True Health took substantial steps to address the CMS's and Department of Justice's concerns, including hiring regulatory counsel and financial advisors.[25]

[¶ 25]   During this time, True Health conducted quarterly board meetings that discussed the current legal issues facing the company, including a sealed *qui tam* lawsuit from 2015 that alleged various kickback schemes.[26] At least one Riverside representative attended each meeting.[27]

[¶ 26]   By June 6, 2019, True Health reached a settlement agreement with the federal agencies regarding the first suspension.[28]   The board of

---

[23] Pet. ¶ 75; Greenberg Dep. 183:12–15, 187:18–19 (Defs' 2 App. 0545–46).
[24] DOJ Meeting Notes (Defs' 2 App. 0515–23).
[25] Zucker Declaration ¶ 19 (Defs' 2 App. 0603).
[26] *Qui Tam* Lawsuit (Defs' 2 App. 0393–513).
[27] *See, e.g.*, 1Q17 Board Meeting Minutes (Defs' 1 App. 0138–47).
[28] Pet. ¶ 76.

0010

directors approved this settlement.[29]

[¶ 27]   One week later, CMS placed True Health on a second 100% Medicare suspension due to further "credible allegations of fraud" for medically unnecessary service claims.[30]   These allegations, however, were distinct from the allegations in the first Medicare suspension.[31]

[¶ 28]   One month later, True Health sued CMS to stop the suspension and obtained a temporary restraining order.[32]   CMS responded by filing Special Agent Geren's declaration that described various wrongdoings by True Health in detail, including a scheme to use rural hospitals to obtain higher reimbursement rates and "medical services organizations" (MSOs) to funnel kickbacks to doctors.[33]

[¶ 29]   On July 22, 2019, that court denied True Health's preliminary injunction request to reinstate the Medicare payments.[34]   That court also denied True Health's motion to seal, making the Geren Declaration publicly available.[35]

---

[29] Pet. ¶ 76.
[30] Pet. ¶ 76; CMS Notice of Second Suspension (Defs' 2 App. 0525).
[31] CMS Notice of Second Suspension (Defs' 2 App. 0525).
[32] 2019 CMS Lawsuit (Defs' 2 App. 0551–74).
[33] Geren Declaration (Defs' 2 App. 0582–90).
[34] Zucker Declaration ¶ 22 (Defs' 2 App. 0604).
[35] Defs' 2 App. 0591–94.

[¶ 30]   The following week, True Health filed for bankruptcy.[36]  True Health's application for bankruptcy included Clifford A. Zucker's Declaration in Support of First Day Relief.[37]   Mr. Zucker was True Health's Chief Restructuring Officer.[38]  His declaration directly tied True Health's financial condition to the CMS suspensions.[39]

[¶ 31]   The bankruptcy court approved True Health's liquidation plan on November 26, 2019.  The plan was substantially completed by December 6, 2019.[40]

[¶ 32]   On April 6, 2020, the liquidating trustee sent a claim notice letter to True Health officers and directors threatening a lawsuit for breach of fiduciary duties for failing to monitor and control the company's legal compliance.[41]  Riverside's Hal Greenberg, Jay Reynolds, and George Benson were included in the list of those threatened by the liquidating trustee lawsuit.[42]

---

[36] Pet. ¶ 76; Zucker Declaration (Defs' 2 App. 0596–638).

[37] Zucker Declaration (Defs' 2 App. 0595–638).

[38] Zucker Declaration ¶ 1 (Defs' 2 App. 0596).

[39] Zucker Declaration ¶s 17–22 (Defs' 2 App. 0603–04).

[40] Pet. ¶ 77.

[41] Notice of Claim Against True Health Directors and Officers (Defs' 2 App. 0640–43).

[42] Notice of Claim Against True Health Directors and Officers at 1–2 (Defs' 2 App. 0640–41).

[¶ 33]   The trustee filed that lawsuit, without Greenberg, Reynolds, and Benson as defendants, on January 25, 2021.[43]  The trustee's lawsuit described in detail the same rural hospital and MSO schemes that Special Agent Geren discussed in his declaration, among other issues.[44]

[¶ 34]   In April 2022, the court unsealed the *qui tam* lawsuit.[45]

[¶ 35]   In October 2022, the U.S. District Court for the Eastern District of Texas unsealed a criminal case that revealed that a grand jury had indicted Christopher Grottenthaler in part based on the Little River Healthcare (LRH) kickback scheme.[46]

[¶ 36]   Finally, on October 7, 2024, Christopher Grottenthaler entered a guilty plea to one count of conspiracy to commit illegal renumerations in violation of 18 U.S.C. § 371.[47]

## C. Procedural History

[¶ 37]   Plaintiffs (Riverside) filed suit in the 298th Judicial District Court of Dallas County, Texas on January 23, 2025.[48]

---

[43] Trustee Lawsuit (Defs' 2 App. 0645–726).
[44] Trustee Lawsuit (Defs' 2 App. 0645–726).
[45] Pet. ¶ 79.
[46] Pet. ¶ 80; Grottenthaler Indictment (Pls' 2 App. 609–59).
[47] Pet. ¶ 81.
[48] Pet.

[¶ 38]   Defendants removed the case to this court on March 7, 2025.[49]

[¶ 39]   Defendants then moved for traditional summary judgment arguing that each of Riverside's causes of action are barred by the applicable statute of limitations.[50]

[¶ 40]   Riverside alleged that defendants acted jointly and severally to misrepresent in the SPA that True Health was in material compliance with applicable healthcare laws.[51]   Riverside claims these misrepresentations induced it to enter the SPA and invest in True Health.   Because these representations were false, Riverside lost millions of dollars.[52]   Thus, it sued defendants for fraud, money had and received, and conspiracy.

[¶ 41]   Riverside's claims are explicitly rooted in the LRH and MSO schemes discussed in the Geren Declaration.[53]

[¶ 42]   The parties briefed and the court held arguments on the summary judgment issues.   Subsequently, the court granted summary judgment, with this opinion following.

---

[49] Defendants' Notice of Removal.
[50] MSJ.
[51] Pet. ¶ 84.
[52] Pet. ¶ 87, 89.
[53] Pet. ¶s 57–61; Geren Declaration (Defs' 2 App. 0582–90).

0014

# V. APPLICABLE LAW

## A. Summary Judgment Standards

[¶ 43]   A defendant may move for summary judgment at any point with or without supporting affidavits but must state the specific grounds within the motion.  TEX. R. CIV. P. 166a(b) and (c).

[¶ 44]   A court *shall* grant summary judgment if the summary judgment evidence shows that there is no genuine issue as to any material fact and the movant, as a matter of law, is entitled to summary judgment on the issues expressly brought forth.  *Draughon v. Johnson*, 631 S.W.3d 81, 87 (Tex. 2021) (citing TEX. R. CIV. P. 166a(c)).

[¶ 45]   All reasonable inferences will be taken in the nonmovant's favor, and all evidence favorable to the nonmovant will be taken as true.  *JLB Builders, LLC v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

## B. Riverside's Causes of Action

[¶ 46]   The elements of fraud are that (i) a material representation was made, (ii) it was false, (iii) the speaker knew it was false when they made it or recklessly made it without knowing the truth, (iv) it was made with the intent that the other party act upon it, (v) the party acted upon it, and (vi) it caused injury to the party.  *Formosa Plastics Corp. USA v. Presidio Eng'rs &*

*Contractors*, 960 S.W.2d 41, 47 (Tex. 1998).  Plaintiff's reliance on the material representation must be justifiable.  *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018).

[¶ 47]   A claim for money had and received involves the plaintiff proving the defendant has money belonging to him in equity or good conscience.  *Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 189 (Tex. App.—Dallas 2013, pet. denied).

[¶ 48]   Civil conspiracy requires (i) two or more persons, (ii) an object to be accomplished, (iii) a meeting of the minds on the object or a course of action, (iv) at least one overt, unlawful act, and (v) proximate damages.  *Agar Corp., Inc. v. Electro Cirs Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

## C. Statutes of Limitations

[¶ 49]   A defendant requesting summary judgment on the statute of limitations must conclusively establish "(1) when the cause of action accrued, and (2) that the plaintiff brought its suit later than the applicable number of years thereafter."  *Draughon*, 631 S.W.3d at 89 (quoting *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 220 (Tex. 2004)).

### 1.  Applicable Statutes of Limitations

[¶ 50]   Fraud is subject to a four-year statute of limitations.  *Williams v.*

0016

*Khalaf*, 802 S.W2d 651, 658 (Tex. 1990); *see* TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4).

[¶ 51]   Conspiracy applies the statute of limitations for the underlying tort; because Riverside's cause of action is for fraud, the applicable statute of limitations is four years in this case.[54]   *Agar Corp.*, 580 S.W.3d at 138; *Williams*, 802 S.W2d at 658.

[¶ 52]   Money had and received has a two-year statute of limitations. *City of Beaumont v. Moore*, 202 S.W.2d 448, 452 (Tex. 1947); TEX. CIV. PRAC. & REM. CODE § 16.003.   Thus, if Riverside's fraud claim is time barred, then its money had and received claim is also time barred and does not require a separate analysis.

## 2. The Default Accrual Rule

[¶ 53]   A cause of action accrues when a legal injury occurs, regardless of whether the injury has been discovered or all resulting damages have occurred. *Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Triex Tex. Holdings, LLC*, 659 S.W.3d 456, 461 (Tex. 2023).  A legal injury is an invasion of a plaintiff's rights that gives rise to a cause of action. *Murphy v. Campbell*,

---

[54] Pet. ¶s 83–89.

964 S.W.2d 265, 270 (Tex. 1997).

### 3. The Discovery Rule

[¶ 54]   The discovery rule concerns when accrual occurs and applies "[w]hen the nature of an injury is inherently undiscoverable, and the evidence of injury is objectively verifiable." *Est. of Ewers*, 695 S.W.3d 603, 620 (Tex. App.—Houston [1st. Dist.] 2024, no pet.).   Inherently undiscoverable means the injury is unlikely to be discovered in the limitations period even when exercising diligence. *Id.*

[¶ 55]   The discovery rule applies in fraud cases and defers accrual until the plaintiff knew or should have known of, through the exercise of reasonable diligence, facts giving rise to the cause of action. *Id.*; *Draughon*, 631 S.W.3d at 89.   However, the claimant need not know the exact nature of each wrongdoing, the actual cause, possible cures, or the exact wrongdoer. *Marcus*, 659 S.W.3d at 462.

[¶ 56]   The discovery rule accrual date has also been expressed in terms of "inquiry notice." *United Healthcare Servs., Inc. v. First Street Hosp. LP*, 570 S.W.3d 323, 336 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).   Under this approach, knowledge of facts that would lead a reasonably prudent person to inquire and to discover the cause of action within the statute of limitations

0018

period (critical date) is equivalent to knowledge of the cause of action for limitations purposes. *Id.*

[¶ 57]   Constructive notice of the alleged harm is presumed when there is publicly available and readily accessible information that would lead to the injury being discovered. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 58–59 (Tex. 2015).

[¶ 58]   The defendant bears the summary judgment burden to negate the discovery rule by either "conclusively establishing that (1) the discovery rule does not apply, or (2) if the rule applies, the summary judgment evidence negates it." *Draughon*, 631 S.W.3d at 90.   That is, the evidence conclusively establishes the discovery rule time period ended and the accrual period began more than four years before the plaintiff sued (for fraud claims).

### 4. Fraudulent Concealment

[¶ 59]   The fraudulent concealment doctrine has a similar effect as the discovery rule. *Marcus*, 659 S.W.3d at 463.   However, it tolls the statute of limitations (based on the defendant's conduct concealing the injury), instead of deferring accrual. *Ewers*, 695 S.W.3d at 620.   Also, the burdens are reversed between the two doctrines.

[¶ 60]   Fraudulent concealment is an equitable doctrine under which a

defendant cannot rely on the limitations defense if it deceitfully concealed the wrongdoing. *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983); *Hooks*, 457 S.W.3d at 60.

[¶ 61]   The estoppel effect stops once a party learns of facts or circumstances that would lead a reasonably prudent person to investigate and, if pursued, uncover the wrongdoing. *Marcus*, 659 S.W.3d at 464.

[¶ 62]   Once the defendant establishes the statute of limitations defense, the burden shifts to the plaintiff to raise a fact issue regarding a fraudulent concealment counter-affirmative defense. *Draughon*, 631 S.W.3d at 93.

[¶ 63]   As discussed above, the discovery rule (accrual) and fraudulent concealment (tolling) account for separate, non-overlapping time periods.

## VI.   DISCUSSION

### A. Introduction

[¶ 64]   The court concludes that as a matter of law Riverside's cause of action accrued no later than April 6, 2020, when the trustee sent the claim notice letter to True Health's former directors and officers.

[¶ 65]   Several events preceding the letter support that conclusion. Each alone may have led a reasonably prudent person to make an inquiry that

would have led to Riverside uncovering its causes of action within the limitations period. However, the court resolves all reasonable inferences in Riverside's favor and takes all evidence favorable to Riverside as true. *JLB Builders*, 622 S.W.3d at 864.

[¶ 66]  Nevertheless, no reasonable person could have determined after April 6, 2020, that Riverside lacked sufficient evidence to begin an investigation into defendants' misrepresentations and that the investigation would have uncovered the fraud within the four-year period.

## B. Fraud and Conspiracy

### 1. Legal Injury

[¶ 67]  Riverside suffered a legal injury the day it signed the SPA because the SPA contained the allegedly fraudulent representations. *See Formosa Plastics*, 960 S.W.2d at 47. Essentially, Riverside overpaid for a healthcare services company that was allegedly violating healthcare laws and would go bankrupt.

[¶ 68]  However, because fraud is a type of injury to which the discovery rule categorically applies, the accrual date of Riverside's fraud and conspiracy claims is deferred until the discovery rule is negated. *Ewers*, 695 S.W.3d at 620.

0021

## 2. Defendants conclusively negated the discovery rule.

### a. Knew or Should have Known / Inquiry Notice

[¶ 69]  Because of the information available, Riverside at least had inquiry notice, meaning they knew of facts that would lead a reasonably prudent person to begin investigating by April 6, 2020. *United Healthcare*, 570 S.W.3d at 336. This inquiry notice is equivalent to knowledge of its cause of action sufficient to begin the limitations period if that investigation would have uncovered a good faith basis to sue within the limitation period (critical date). *Id.*

[¶ 70]  Facts Riverside knew leading up to the trustee claim letter include:

- True Health acquired the assets and hired personnel from HDL, which went out of business because of systemic healthcare law violations.[55]

- Members of the public accused True Health of continuing the same medically unnecessary testing that HDL had been shut down for.[56]

- Cigna and United Healthcare halted laboratory claim reimbursements due to compliance issues.[57]

---

[55] Geren Declaration ¶ 4 (Defs' 2 App. 0583); Trustee Lawsuit at 21 n.17 (Defs' 2 App. 665).
[56] *See* Pls' 2 App. 255–59.
[57] Trustee Lawsuit ¶ 129 (Defs' 2 App. 0679).

- True Health received a CID and multiple suspensions from Medicare because of alleged healthcare law violations.[58]

- The Geren Declaration was made public, detailing the rural hospital and MSO schemes and providing specific facts that Riverside could have verified.[59]

- True Health filed for bankruptcy. The company is liquidated, wiping out $83 million that Riverside had invested and solidifying its legal injury.[60] As part of the bankruptcy filings, Clifford A. Zucker (Chief Restructuring Officer) provides a declaration that tied the bankruptcy to the CMS suspensions and improper business practices dating back to 2015.[61]

[¶ 71] Throughout all these events, Riverside occupied or controlled True Health's board of directors and received regular updates from the legal team.[62]

[¶ 72] Finally, on April 6, 2020, Riverside received a claim letter from the bankruptcy trustee, further tying the improper business practices to the resulting bankruptcy.[63] The notice accused the board and other directors of

---

[58] Pet. ¶s 73–76; Trustee Lawsuit ¶ 128 (Defs' 2 App. 0679); CMS Notice of First Suspension (Defs' 2 App. 0388-91); CMS Notice of Second Suspension (Defs' 2 App. 0525); Zucker Declaration ¶s 18–19 (Defs' 2 App. 0603).

[59] Geren Declaration (Defs' 2 App. 0582–90); Defs' 2 App. 0591–94.

[60] Pet. ¶s 76–77; Zucker Declaration (Defs' 2 App. 0596–638).

[61] Zucker Declaration (Defs' 2 App. 0595–638).

[62] Pet. ¶ 75; Greenberg Dep. 110:17–23, 183:12–15, 187:18–19 (Defs' 2 App. 0539, 0545–46); Board Minutes (Defs' 1 App. 0150); *see also, e.g.*, 1Q17 Board Meeting Minutes (Defs' 1 App. 0138–47).

[63] Notice of Claim Against True Health Directors and Officers (Defs' 2 App. 0640–43).

failing to control and monitor the company's legal compliance, blaming them for the bankruptcy. At this point, Riverside and its principals had an overriding personal interest to investigate the allegations, if only to prepare a defense to the trustee's allegations.

[¶ 73] Disinterested third parties related many of these facts to Riverside. Detailed allegations of fraud presented by a disinterested third-party individual would have led a reasonably prudent individual to investigate. *See United Healthcare*, 570 S.W.3d at 336.

[¶ 74] Further, Riverside need not know the exact nature, cause, possible cures, or person responsible for the wrongdoing. *Marcus*, 659 S.W.3d at 462. It needed to know only that it should have investigated.

[¶ 75] Thus, by April 6, 2020, Riverside had notice of (i) a history of allegations against True Health for illegal business practices and (ii) investigations engaged in by disinterested third parties tying those improper business practices to Riverside's economic loss and even accusing Riverside's principals of wrongdoing themselves. The court concludes that as a matter of law this is sufficient notice to begin the accrual period for Riverside's fraud and conspiracy causes of action.

[¶ 76] Finally, Riverside argues throughout its response that True

0024

Health's general and outside counsel assured Riverside that True Health was not violating healthcare laws.[64] However, as a sophisticated entity, the court holds Riverside responsible for knowing that "[a] lawyer employed or retained by an organization represents the entity" not the individual shareholders. TEX. R. PROF. COND. 1.13; *see In re Mktg. Invs. Corp.*, 80 S.W.3d 44, 49 (Tex. App.—Dallas 1998, orig. proceeding) ("In a corporation's affairs [] there is but one client—the corporation."). Accordingly, the court concludes that Riverside's reliance on True Health's counsel did not absolve it of an independent duty to investigate.

### b.    A reasonable investigation would have uncovered the fraud.

[¶ 77]  Based on an April 6, 2020, accrual date, the evidence must conclusively show that Riverside would have discovered its good faith right to sue by April 6, 2024 (critical date) had it conducted a reasonable investigation. *Ewers*, 695 S.W.3d at 620.

[¶ 78]  Had Riverside conducted a reasonable investigation into the SPA's misrepresentations, it would have discovered the fraudulent scheme. *See Marcus*, 659 S.W.3d at 464.  Riverside concedes that the agreement with

---

[64] Riverside's Opp. to MSJ at 15–16, 22, 41–45.

0025

Little River Healthcare, which facilitated violations of multiple healthcare laws, existed since 2015.[65] The LRH agreement explicitly outlines the fraudulent activities, including the MSO and rural hospital schemes, and establishes that the improper business practices predated the SPA.[66]

[¶ 79] True Health's fraudulent schemes involved extensive transactions and payments, all of which would have been reflected in the business books and records.[67] Riverside makes no argument as to why it could not have found these records by April 6, 2024.

[¶ 80] Riverside had a statutory right to look at the books and records or could have instigated an independent investigation to reveal the fraud. 6 Del. C. § 18-305.

[¶ 81] Further, there was readily accessible and publicly available information sufficient to give Riverside actual or constructive notice which also begins the limitations period. *See Hooks*, 457 S.W.3d at 58–59.

[¶ 82] Finally, Riverside's ability to uncover these schemes is evidenced by the various individuals who did so prior to April 6, 2020,

---

[65] Pet. ¶s 57–61.
[66] Pet. ¶s 58–61.
[67] Pet. ¶ 81.

including members of the public, Special Agent Geren, and CMS.[68]

[¶ 83]  In the four years between April 6, 2020, and April 6, 2024, the liquidating trustee also uncovered True Health's fraudulent schemes.[69]

[¶ 84]  Further, two years after the bankruptcy liquidation occurred, the United States District Court for the Eastern District of Texas released the indictment against Christopher Grottenthaler.[70]  That indictment detailed the fraud that began before the SPA.

[¶ 85]  The *qui tam* lawsuit was also unsealed during this period.[71]

[¶ 86]  At a minimum, these cumulative third parties' actions and their ability to uncover the alleged fraud conclusively shows what Riverside could have reasonably discovered had it investigated.

### 3. Riverside failed to raise a genuine issue of material fact regarding fraudulent concealment.

[¶ 87]  Based on an April 6, 2020, accrual date, a four-year limitations period, and a January 23, 2025, filing date for this lawsuit, Riverside needed

---

[68] *See* Pls' 2 App. 255–59; Geren Declaration (Defs' 2 App. 0582–90); Trustee Lawsuit at 21 n.17 (Defs' 2 App. 665); CID (Defs' 1 App. 0363–87); CMS Notice of First Suspension (Defs' 2 App. 0388–91); CMS Notice of Second Suspension (Defs' 2 App. 0524–27).

[69] Trustee Lawsuit (Defs' 2 App. 0645–726).

[70] Grottenthaler Indictment (Pls' 2 App. 609–59).

[71] Pet. ¶ 79; *Qui Tam* Lawsuit (Defs' 2 App. 0393–513).

292 days of tolling to defeat the statute of limitations.

[¶ 88]   However, Riverside adduced no evidence that defendants said anything about the wrongdoing, nor did Riverside argue defendants concealed anything from them after April 6, 2020.  Thus, Riverside provided no evidence that would create a genuine material fact issue of fraudulent concealment after April 6, 2020.

[¶ 89]   Therefore, as a matter of law, Riverside cannot rely on fraudulent concealment to defeat defendants' summary judgment motion.

[¶ 90]   Accordingly, because Riverside's causes of action accrued no later than April 6, 2020, which is more than four years before it filed suit on January 23, 2025, and because no tolling applies, its fraud and conspiracy claims are barred by the statute of limitations.

## C. Money Had and Received

[¶ 91]   Riverside's money had and received cause of action has a two-year limitations period.  Because defendants proved the four-year limitations period bars Riverside's other causes of actions, the money had and received limitations cause of action is also barred.

# VII. CONCLUSION

For the above reasons, the court granted defendants' motion for summary judgment.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  September 17, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rogge Dunn
Bar No. 6249500
dunn@RoggeDunnGroup.com
Envelope ID: 108965768
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellants' Opening Brief
Status as of 12/11/2025 7:15 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| LaDawn Nandrasy | 4715800 | ladawn.nandrasy@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Sean Lemoine | | sean.lemoine@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Rashella Widdoes - Paralegal | | widdoes@RoggeDunnGroup.com | 12/10/2025 7:14:12 PM | SENT |
| Colin PBenton | | colin.benton@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Lanette Fidone | | lanette.fidone@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Samantha Tandy | | samantha.tandy@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Zachary Farrar | | Zachary.Farrar@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Harvey Joseph | | Joseph@roggedunngroup.com | 12/10/2025 7:14:12 PM | SENT |
| Adam Gogolak | | AMGogolak@wlrk.com | 12/10/2025 7:14:12 PM | SENT |
| William Savitt | | WDSavitt@wlrk.com | 12/10/2025 7:14:12 PM | SENT |
| Michael Avi-Yonah | | MSAviYonah@wlrk.com | 12/10/2025 7:14:12 PM | SENT |
| Karina Enriquez | | karina.enriquez@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |
| Lane Webster | | webster@RoggeDunnGroup.com | 12/10/2025 7:14:12 PM | SENT |
| Rogge Dunn | | dunn@roggedunngroup.com | 12/10/2025 7:14:12 PM | SENT |
| Barb Morgan | | barb.morgan@wickphillips.com | 12/10/2025 7:14:12 PM | SENT |